5/15/08

UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

In re:

BRUSHY BROOK DEVELOPMENT CO., LLC
Debtor

BK 05-13009
CHAPTER 7

OBJECTION TO MOTION FOR APPROVAL OF COMPROMISE

I, CHARLES E. FOGARTY, being one of the creditors in this matter, hereby object to the motion for approval of compromise filed by LR6-A, LLC ("LR6-A") and the Chapter 7 Trustee ("Trustee"). I also reiterate my request that the Court order discovery to proceed and defer action on any settlement or resolution of this case until discovery has been completed. I believe that I am not presently represented by legal counsel due to John Boyajian's motion to withdraw as my attorney, and I therefore personally address the Court in this matter. My reasons for this objection and these requests are as follows:

On May 9, 2008 I submitted an objection to a motion to withdraw as my attorney filed by John Boyajian and the same request stated above. A copy of that objection and request is attached as Exhibit A and incorporated, and the arguments and representations relating to this case in that memorandum apply equally in this objection.

In addition I believe that the property LR6-A is requesting to foreclose on has been seriously under valued in representations made to this Court by LR6-A and the Trustee. That value is based on an appraisal performed by Peter M. Scotti and Associates, a firm that has had, in my opinion, a history of undervaluing this specific parcel of real estate. Mr. Scotti's firm previously appraised the property in 2002 on behalf of the State of Rhode Island as part of a State purchase of the premises, and that appraisal was flawed and resulted in a lower value being placed on the premises. That appraisal was challenged in a report issued by Roy C. Schaffer,

MAI dated July 8, 2002. Mr. Scotti's firm's current valuation on behalf of Realty Financial Partners ("RFP") fails to address the points raised in 2002, and the filing made with the Court omits comparable sales data.

Submitted herewith are a series of valuations conducted by James A. Houle and Associates dated June 28, 2001, dated March 26, 2007 (effective April, 2002) and also dated March 26, 2007 (effective August, 2005). The initial June 28, 2001 valuation contained an assumption of facts which subsequently proved to be incorrect, and that valuation was corrected in the April, 2002 report dated March 26, 2007. Those reports value the property at $8,100,000.00 in 2002 and $10,000,000.00 in 2005.

Also submitted are a series of documents and letters relating to the sale of individual lots in 2004. These are actual transactions in which deposits were made primarily by builders to purchase lots for amounts consistent with the values stated in the Houle appraisal reports. Subsequently it was learned that Grant and Byron Schmidt failed to renew the RI DEM permits, and these transactions had to be cancelled and the funds returned. These documents are submitted to support what I believe to be the real valuation of the property.

If the compromise is approved the Trustee will receive $100,000.00. In theory the Trustee could receive more if the foreclosure auction results in a reasonably fair market value being paid for the premises, however, I suggest and strongly believe that the foreclosure will not result in a fair market value being paid for the premises. I submit that if the compromise is approved and the foreclosure completed, the amount paid will not exceed the amount due LR6-A plus foreclosure expenses. I repeat my statement in the memo filed on May 9, 2008: It is my position that the mortgage held by LR6-A is a loan to own scam. I believe what will happen is that parties having a relationship with RFP, possibly undisclosed, will end up owning the real

estate at significantly less than fair market value, and I and the other creditors and shareholders will end up with no benefit and no remedy.

I repeat my request that the discovery process initiated by the Trustee in 2007 be completed and the U.S. Trustee be empowered to undertake such discovery. I continue to believe that once discovery has been completed, the Court will conclude that the appropriate action in this case is to void the loan from LR6-A as usurious and beyond redemption by a reconfiguration of the rate of interest.

If the Court feels that the motion for approval of compromise should be granted, I ask that the net foreclosure proceeds, after payment of legitimate foreclosure expenses, be paid to the Court and held in escrow pending final judgment in this matter.

Filed with this objection are copies of the following documents:

1. Complete Appraisal - - Summary report dated June 28, 2001 by James A. Houle and Associates.

2. Summary Report of Complete Appraisal dated May 15, 2002 by Peter M. Scotti and Associates.

3. Letter dated July 8, 2002 from Roy C. Schaffer, MAI regarding Appraisal of Reserve at Brushy Brook.

4. Complete Appraisal - - Summary Report as of April, 2002 dated March 26, 2007 by James A. Houle and Associates.

5. Complete Appraisal - - Summary Report as of August, 2005 dated March 26, 2007 by James A. Houle and Associates.

6. Documents relating to sale of lots in 2004 by Cheryl L. Eley of Residential Properties, Ltd.

The facts represented and opinions expressed in this memorandum are made based upon facts believed to be true to the best of my knowledge and belief.

Respectfully Submitted,

Charles E. Fogarty
251 Narragansett Avenue East
Wakefield, Rhode Island 02879

CERTIFICATION

I hereby certify that a copy of the within Objection to Motion for Approval of Compromise was mailed to:

Robert D. Wieck, Esq.
Denean M. Russo, Esq.
MacAdams Wieck Deluca & Gemma Incorporated
101 Dyer Street, Suite 400
Providence, Rhode Island 02903

Matthew J. McGowan, Esq.,
Salter McGowan Sylvia & Leonard
321 South Main Street
Providence, Rhode Island 02903

Leonard J. DePasquale, Esq., AUST
United States Trustee's Office
10 Dorrance Street, Suite 910
Providence, Rhode Island 02903

Stephen J. Brouillard, Esq.
Orson & Brusini Ltd.
55 Dorrance Street, Suite 400
Providence, Rhode Island 02903

Theodore Orson, Esq.
325 Angell Street
Providence, Rhode Island 02906

Thomas E. Carlotto, Esq.
Shechtman Halperin Savage
1080 Main Street
Pawtucket, Rhode Island 02860

Peter J. Furness, Esq.
Sinapi Formisano & Co.
100 Midway Place, Suite 1
Cranston, Rhode Island 02920

John Boyajian, Esq.
Boyajian, Harrington & Richardson
182 Waterman Street
Providence, Rhode Island 02906

Akhil M. Patel, Esq.
Thompson Hine LLP
10 West Broad Street
Columbus, Ohio 43215

Charles A. Pisaturo, Jr., Trustee
Law Offices of Charles A. Pisaturo, Jr.
1055 Elmwood Avenue
Providence, Rhode Island 02907

William M. Dolan, III, Esq.
Brown Rudnick Berlack Israels LLP
121 South Main Street
Providence, Rhode Island 02903

John A. Tarantino, Esq.
Patricia A. Rocha, Esq.
Joseph Avanzato, Esq.
Katy A. Hynes, Esq.
Adler Pollock & Sheehan
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903

Vincent A. Indeglia, Esq.
Indeglia & Associates
1485 South County Trail
East Greenwich, Rhode Island 02818

Rhode Island Division of Taxation
One Capitol Hill, Suite 2-D
Providence, Rhode Island 02908

John P. McCoy, Esq.
Carroll, Kelly & Murphy
One Turks Head Place, Suite 400
Providence, Rhode Island 02903

I hereby certify that on the 15th day of May, 2008, I sent by first class mail, postage prepaid, a copy of the within Objection to Motion for Approval of Compromise (without attachment numbers 1 through 6 above, which has been filed with the Court) to the above named individuals.

Charles L. Bogarty

UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

In re:

BRUSHY BROOK DEVELOPMENT CO., LLC
Debtor

BK 05-13009
CHAPTER 7

OBJECTION TO MOTION TO WITHDRAW AND REQUEST FOR ORDERS REGARDING DISCOVERY

I, CHARLES E. FOGARTY, being one of the creditors in this matter, hereby object to the motion by my attorney, John Boyajian, to withdraw as my attorney. I also request that the Court issue orders regarding discovery and not approve any settlement or resolution of this case until discovery has been completed. My reason for this objection and these requests are as follows:

This matter was brought to this Court in the Fall of 2005 in an effort to unravel a transaction that defrauded shareholders of Stone Ridge, Inc. ("Stone Ridge"), including myself. The transaction involved was a sale of real property in Hopkinton, Rhode Island by the Debtor, Brushy Brook Development Co., LLC ("Brushy Brook"), an entity wholly owned by Stone Ridge and which was the only asset owned by Stone Ridge. The terms of the transaction included a clearly and admitted usurious $2,500,000.00 loan to the purchaser, Boulder Brook Development Co., LLC ("Boulder Brook") from an entity identified as LR6-A Limited Partnership ("LR6-A"). LR6-A has been identified as an entity through which David Allen and Realty Financial Partners ("RFP") engage in business. The loan carried a stated interest rate of 21% compounded monthly plus an additional $1,250,000.00 minimum first year interest. Secondary financing of the transaction in the form of a $3,200,000.00 obligation from Boulder Brook to Brushy Brook was also made a part of the transaction.



Exhibit A - Page1

Attorney Boyajian filed with this Court an objection to a proposed consent order in which he details the transaction, how the claims of the real parties in interest, being shareholders and creditors of Stone Ridge and creditors of Brushy Brook, were left without any interest of value in the property following the transaction and how the consent order would fail to provide them any remedy. Subsequent to that filing and one or more conferences with the Court, a disagreement has arisen between Attorney Boyajian and myself over how to proceed and whether the consent order should be entered. I believe it is premature to approve such a resolution, and I further believe that it is imperative that discovery proceed prior to the Court entering any dispositive orders.

As important as what this case is about, it is equally important to recognize what it is not about. This is not about a debtor coming into court seeking relief from having made a bad business decision or a bad bargain. This is not about people who received money and are now seeking to avoid having to repay the loan. This case is, in my opinion, about a wide ranging fraud conducted as part of a regular business practice in an organized and criminal venture. This is not a solitary transaction, but it is one of a number of operations engaged in by RFP and the parties who support RFP and profit from RFP's ventures. I believe that the pattern of business involves inter-connected persons and organizations taking advantage of stressful financial situations to engage in usurious and predatory lending practices by using funds provided by third parties who do not want to know how the funds are used and who are not accountable for the use of their funds. The private harm to myself and shareholders and creditors such as me is only a partial result of this conduct, and I strongly feel that the harm to the public and public policy needs to be explored.

The Court is aware that at least one other legal proceeding is pending that alleges many of the same facts as are involved in this case. (The Meadows Creek LLC case, so-called, [Massachusetts Suffolk County Superior Court Case No. 06-2804] and I understand that the matter is proceeding with an expected trial date in the Fall of 2008.) (See attached Bloomberg.com article) Additionally the Court can infer that RFP or an RFP entity has engaged in at least one other usurious loan in Massachusetts - - the letter to the Massachusetts Attorney General that was supposed to excuse the usury in this case actually involved Conant Crossing LLC and Conant Land Investment, LLC. There is a clear link between one of the parties involved in Boulder Brook (Attorney Jonathan Savage) and RFP - - Mr. Savage's firm, Shechtman Halperin Savage, LLP, lists Realty Financial Partners as one of its clients on its firm's website. (See attached website listing) In addition to Mr. Savage's conflict of interest, I believe that Ralph Palumbo's conduct as a member of Boulder Brook and active participant in the transaction was an undeniable conflict of interest and violation of the fiduciary obligation he owned me, Stone Ridge and Brushy Brook as our accountant. Finally, I believe that the conduct of Grant and Byron Schmidt, whose testimony before this Court have been disingenuous, if not outright perjury, provided the impetus for engaging in the transaction that precipitated this case. The Court should keep in mind that the only money actually paid by Boulder Brook (and borrowed from LR6-A) at the closing was used for transaction expenses (recording, title, tax stamps, legal fees, etc.) and to pay off mortgage lenders of Brushy Brook for loans on which Grant Schmidt was personally liable and for monies largely used by he and Byron Schmidt.

It is my position that the sale transaction that resulted in a first mortgage held by LR6-A was a loan to own scam and that the second mortgage loan to the Debtor, Brushy Brook Development Co., LLC ("Brushy Brook") is worthless if the loan held by LR6-A is allowed to

stand. I have been advised that the loan is interpreted in accordance with Massachusetts law, and that under Massachusetts law usurious loans can be voided or restructured to be within legal limits. The question seems to be whether a lesser penalty of reducing the interest rate pursuant to Massachusetts law is an appropriate alternative. I do not believe the lesser penalty is appropriate. If this was an isolated case, rather than one example of an on-going business operation, or if I was a debtor who was seeking to avoid payment of a bad business loan, rather than a defrauded shareholder and creditor, restructuring might be appropriate. Whether the interest rate is reduced to 18% or even less is irrelevant given the current nature of the real estate market and the overwhelming amount due on the loan held by LR6-A. The financial payment to the Trustee should the premises be sold will do little more than pay the Trustee's fees and expenses. Such a settlement leaves me, as a shareholder of Stone Ridge with nothing. If the loan held by LR6-A is declared to be void, the mortgage held by Brushy Brook, the asset held by Stone Ridge, would have value, and individual shareholders of Stone Ridge and creditors of Stone Ridge and Brushy Brook would be potentially able to obtain some relief.

I believe that once discovery efforts have been completed the Court will concur that the loan is part of a pattern of conduct engaged in by the real parties in interest of Boulder Brook and LR6-A. I further believe that the Court will conclude that the purpose of these transactions is to result in LR6-A, or parties associated to or conspiring with the LR6-A real parties in interest, becoming the owners of property at less than fair market value and profiting thereby. I believe such findings justify voiding the loan.

The Court has heard a significant amount of testimony and evidence in this matter regarding the underlying nature of the claims of shareholders of Stone Ridge, Inc. and actions taken by others on behalf of the Debtor, Brushy Brook. These actions include serious

mismanagement of the property and development proposals, sham business transactions, insider dealings by persons owing a fiduciary obligation to other parties involved to the detriment of those parties, misrepresentations to this Court and other such conduct. The Court has been satisfied that the evidence warranted going forward with the bankruptcy petition, and we have now reached the ultimate issue in the case before the Court - - how to handle the LR6-A loan and the sale transaction. I believe the objection to the proposed settlement filed by Attorney John Boyajian states sufficient grounds and valid reasons for rejecting the settlement at this time. I believe the Court will be better able to rule on the merits of the case once discovery has been completed, and I ask that the objection be sustained.

I understand that the Trustee may not have the resources to accomplish this discovery. I can represent to the Court that I do not have the resources to undertake the discovery process. If the Court has the authority to do so, I ask that the Office of the U.S. Trustee be instructed to undertake the discovery as set forth in the Trustee's Schedule previously submitted and for such other investigations and discovery deemed appropriate by the appointed Trustee, the U.S. Trustee or this Court.

I appreciate Mr. Boyajian's reluctance to remain involved in this case, however, I do not feel that proceeding pro se is in my best interests, and I ask that the Court deny his motion.

The facts represented and opinions expressed in this memorandum are made based upon facts believed to be true to the best of my knowledge and belief.

Respectfully Submitted,

Charles E. Fogarty
251 Narragansett Avenue East
Wakefield, Rhode Island 02879



Exhibit A - Page 5

Bloomberg.com

# Loan-Sharking Accusation Hits Harvard, Yale, Princeton Funds

By Brian Kladko




Enlarge/Details

Nov. 21 (Bloomberg) -- Harvard, Yale and Princeton universities' endowments are being accused of backing a loan with 42 percent interest, twice the legal limit, according to a lawsuit filed by a developer who borrowed the money.

The three Ivy League schools, along with three other universities and two foundations, are named in a civil complaint in state court in Boston alleging they violated a law aimed in part at loan sharks, who make loans with excessive interest rates backed by threats of violence. Fred Fahey, a Dracut, Massachusetts, developer who filed the suit, planned to build a **golf course** community with money borrowed from Realty Financial Partners, a firm in which the schools invested.

The lawsuit is a window into the rarely disclosed money management tactics endowments use. Nonprofit funds last year allocated 39 percent of their assets to alternative investments -- including real estate, private equity, commodities and hedge funds -- up from 23 percent in 2000, according to the **Commonfund Institute**, in Wilton, Connecticut. Yale's endowment gained 28 percent in the 12 months ended June 30, Princeton's 25 percent and Harvard's 23 percent.

In a case of charging 42 percent interest, ``you have to ask if there's an inconsistency between the public purpose'' of universities ``and this type of financial transaction,'' said **Peter Kinder**, the president of **KLD Research & Analytics Inc.** in Boston, which advises nonprofit endowments and pension funds. ``It's a hell of a burden to put on someone.''

Fahey's Meadow Creek LLC planned to build a 186-home community and golf course in Dracut, about 30 miles (48 kilometers) north of Boston.

Liability Issues

Fahey sought financing from **Realty Financial Partners**, based in Wellesley, Massachusetts. The schools and foundations were limited partners in Realty Financial Partners V LP, which in turn was a limited partner in LR5-A LP, the actual lender.

Fahey received two loans from LR5-A totaling $10.1 million; the interest rate of 42 percent was applied to one of the loans for $6.7 million.

Fahey's lawsuit may be trying to get around the legal protection usually afforded limited partners, said Mark Budnitz, a professor at Georgia State University College of Law in Atlanta and author of a book on lender liability. Courts are reluctant to hold limited partners liable, believing it may discourage investment, he said. The foreclosures and losses triggered in recent months by subprime mortgages may lead to a more expansive view of liability, he said.

Limits on Interest

Massachusetts forbids loans with more than 20 percent annual interest. It allows lenders to charge more if they file a notice every two years with the state attorney general.

LR5-A LP did file notices with the attorney general, one on May 8, 2001, and another on Aug. 20 that year. Fahey's suit alleges that the first notice came too soon, before the lending partnership was formed, and the second too late, after the loan was made.

David Rich, 36, the lawyer representing Realty Financial Partners, said in an interview that the timing of the lender's notices was valid.

Besides the Ivy league schools, the suit names the University of Notre Dame, near South Bend, Indiana; Oberlin College in Ohio; **Spelman College** in Atlanta; the **Carnegie Corp. of New York**; and the **John D. and Catherine T. MacArthur Foundation** of Chicago, all also represented by Rich.

Legal Strategy

The defendants argue in court papers that the usury law's requirements don't apply to them because they had no involvement in managing the Meadow Creek investment, and that state law shields limited partners from such claims. The law was aimed at organized crime and loan-sharking, the three Ivy League schools said in a filing, not at limited partners of a lender.

**Joshua Mintz**, general counsel for the MacArthur foundation, said in a statement there was no basis for including the organization in the suit. Spokespeople for the other defendants declined to comment on the lawsuit.

Fahey, 46, first sought a loan in March 2001 from Realty Financial Partners, a lender that has raised almost $1 billion from investors, including the Ivy League universities, since 1994, according to its Web site. Rich said Fahey knew the terms of the loan 2 1/2 months before the closing and was represented by an experienced real estate lawyer.

Fahey said he accepted the terms because he expected to get development approvals within three to six months, allowing him to refinance with a bank. When he couldn't do so and failed to meet the required payments, the lending partnership eventually foreclosed on his property, triggering an auction. The lending partnership reassigned its winning bid on the development to another entity it owns, Rich said.

Fahey is asking the court to declare the loans illegal and is seeking more than $20 million in damages, the amount he claims he could have earned on the project. A mid-December hearing on a motion to dismiss the complaint against the schools and foundations has been requested, said Fahey's attorney, Richard Briansky.

The case is LR5-A Limited Partnership vs. Meadow Creek LLC, Massachusetts Superior Court, Suffolk County, 06-2804.

To contact the reporter on this story: **Brian Kladko** in Boston at **bkladko@bloomberg.net**

*Last Updated: November 21, 2007 00:09 EST*

©2008 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

**Representative Clients**

American Express

American Senior Living Communities, Inc.

Arrow Financial Services, Inc.

Banc One Financial Services, Inc.

Bank of America, N.A.

BigHip

Broadcast Music, Inc.

Capital One

Chartway Federal Credit Union

Citizens Bank of Massachusetts

Citizens Bank of Rhode Island

Coastway Credit Union

Connecticut Community Credit Union

Core BTS

Danvers Bank

Digital Federal Credit Union

Direct Federal Credit Union

Domestic Bank

Dreamhouse Mortgage Corporation

Dunkin Donuts Northeast Distribution Center, Inc.

Eastern Bank

The Education Resources Institute, Inc.

Encompass Media Group

Energy Service Providers

Everhome Mortgage

Federal National Mortgage Association ("Fannie Mae")

First American Lenders' Advantage

First Horizon Home Loans

Foreclosure Management Company

Freeplay Energy plc

Gateway Woodside, Inc.

GMAC Mortgage Corporation

Grand Heritage Hotels Group

GRP Loan, LLC

HomeStar Lending

Horizon Beverage Group

HSBC

Interbay Funding, L.L.C.

Jake Kaplan's, Inc.

Kenneth Castellucci & Associates, Inc.

Key Bank, N.A.

Litton Loan Servicing, L.P.

Mortgage Lenders Network USA, Inc.

MRC Receivables, Corp.

The National Herald

National Settlement Agency

New Century Mortgage Corporation

Ocwen Federal Bank, FSB

Option One Mortgage Corporation

Pride Auto Group

Real Time Resolutions, Inc.

Realty Financial Partners, Inc.

Recovar Group, LLC

Residential Properties Ltd.

Resurgent Capital Services, L.P.

Rhode Island Housing and Mortgage Finance Corporation

Rockland Trust Company

Sau-Sea Foods

Slade's Ferry Trust Company

Sovereign Bank of New England

United States Department of Agriculture

United States Small Business Administration

The Washington Trust Company

United States Fire Insurance Company

Walden Behavioral Care

Webster Bank

Wells Fargo Bank, N.A.

Wells Fargo Home Mortgage

Worldwide Asset Management, LLC

HOUSE REBUTTAL STATE APP.

# STONE RIDGE INC.

**CONFIDENTIAL FACSIMILE TRANSMITTAL SHEET**

**DATE:** 7/14/02

**TIME:** 11:00 A.M.

**TO:** LISA PRIMIANO

**TRANSMIT TO FAX NO:** 222-2069

**FROM:** CHUCK FOGARTY (SRI)

**RE:** APPRAISAL REBUTTAL

**COMMENTS:** LISA. WE THINK SCOTTI'S APPRAISAL IS BASICLY FLAWED. HERE IS ROY SCHAEFFERS RESPONSE. I'LL CALL YOU MON. 7/15/02. WE NEED A SERIOUS WRITTEN OFFER, AS WE ARE MOVING FORWARD CHUCK

**TOTAL NUMBER OF PAGES INCLUDING THIS COVER SHEET** 4

If you experience any problems with this transmission or do not receive all pages, please call (401) 861-4388.

**CONFIDENTIALITY NOTE:** The information transmitted in this facsimile message is sent by an attorney or his/her agent, is intended to be confidential, and for the use of only the individual or entity named above. If the recipient is a client, this message may also be for the purpose of rendering legal advice and thereby priveleged. If the reader of this message is not the intended recipient, you are hereby notified that any retention, dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this facsimile in error, please notify us via telephone, or at the address above via the U.S. mail (we will reimburse postage.)

*NCRA Center for Valuation Services*

P.O.Box 8676, Warwick, Rhode Island 02888
Message and Fax Center (401) 785-0878
Roy C. Schaeffer, MAI

July 8, 2002

Mr. Charles Fogarty
Dye Hill Road
Hopkinton, RI

RE: Appraisal of Reserve at Brushy Brook

Dear Mr. Fogarty:

In 2001, Mr. Houle and myself appraised a multi faceted property in Hopkinton, RI, known as the Reserve at Brushy Brook. It is to consist of an 18-hole golf course with full clubhouse amenities, a 66 lot detached, single-family housing development and a 68 unit condominium complex. Peter Scotti and Associates subsequently appraised the project. As you know, that appraisal presented a much lower value ($3,675,000) than the value that was the final opinion of our report ($9,000,000). As you requested, I have reviewed the Scotti report; the following are my findings.

**Data:** The appraisal approached 100 pages in length, despite having almost no real data. This is remarkable. Consider the following:

*Golf Course Sales Data*: The appraiser used only four sales. Two of these were not comparable, being nine-hole courses. A third sale occurred about five years ago, in the ashes of the real estate recession (1997). The remaining sale was an 18-hole golf course, to be sure, but was a "par-three" course, a significant limitation to the marketability and a serious difference in terms of comparison. Therefore, the only "standard" course sale used for comparison occurred in 1997. One need not be a golfer to come to the conclusion, that, for all practical purposes, the appraiser had no real data whatsoever in his report. Thus, the estimates descending from his analysis are spurious, at best.

The same complaint occurs when dealing with land purchased for construction of a golf course. Sale #1 was consummated in 1997, five years ago. Sale #2 occurred even earlier- 1996. Sale #3 transferred in the midst of the recession- 1993. There is no evidence, certainly from reading the report, to indicate that any of those properties were ever completed as golf courses. In fact, sale #3 is currently being developed, but has changed ownership so many times that the sale in 1993 is totally irrelevant.

Again, the data is not relevant. We had in our report several sales of more comparable golf course sales, although a sale of a course in Bellingham, Massachusetts

had unconfirmed selling data. Since the time of the report, we have been able to confirm the data. Everything we have learned since supports our original numbers, giving strength to our final estimate of value.

For example, the property consisted of about 329 acres of land, of which 118 acres were allocated to the golf course, which includes a 7,500 sf driving range structure. The remaining 211 acres were available for single-family development. Thus, this sale closely resembles the configuration of the subject property. *This property sold in 2000 for $9,200,000.*

We have also learned of a sale in Hopkinton, Mass. This was an 18-hole course that had a clubhouse. This was razed and replaced with a 15,000 sf clubhouse, swimming pool and a cabana facility with a tennis pavilion. *The sale price, without the proposed improvements was $7,500,000.* It occurred only six months ago, in December 2001.

In addition, we have learned of a sale of a raw site, approved for golf course development that recently transferred in Hudson, Mass., for $3,000,000. We have incomplete data regarding what was actually transferred, but it would appear to give overwhelming support to our contention of value for the approved gold course site contained in the subject property. Our estimate was under $2,000,000.

At this point, one can state that the golf course, upon completion, will be worth considerably more that the $2,700,000 estimate reached in the Scotti report. Scotti's estimate as completed, is lower than the undeveloped site sale in Hudson, Mass. In fact, there is a confusing element in Scotti's report, which shows a development cost of $3,500,000 for the golf course, $800,000 more than the completed value of $2,700,000. This is not resolved in the report.

*Single family subdivision*: Given the "hot" real estate market in the past three years, there should be more data than one could wish for. In fact, the appraiser states that lot sales in Hopkinton averaged 45 sales per year over the last 10 years. Nevertheless, the appraiser used only 3 sales to support hie estimate of sell-out. I think a summary of all South County sales would have been more convincing.

Put differently, the use of only 3 sales in an active market leaves us with an unconvincing estimate of market value. Our "scan" of sales showed much higher lot sales prices in this area of Rhode Island. There is no point in going further with the critique, since there is such a dearth of qualified information from which to draw an accurate conclusion.

*Condominium Land*: The same is true for this phase of the appraisal. Again, in the appraisal, there are only 3 sales of land with condo permits, and two of those sales involved the same buyer, effectively leaving use with only two sales. It is interesting that the appraiser made adjustments averaging 40%. A loan underwriter, faced with 40% total adjustments, would balk at approving any appraisal.

Finally, any discussion of current moratoriums on new construction, several of which are in place in South County is lacking. This, in our opinion, is a major issue, as it limits the appeal and feasibility of raw land tracts to be used for development. The subject has all approvals in place and these are exempted from any moratorium, meaning that a developer could start now, without any limitations.

In summary, we can only dismiss the appraisal as being unsupported, since too many sales have been overlooked or dismissed. Further, any discussions of rapid appreciation or building moratoriums is limited. In other words, the scant data precludes a detailed analysis of this or any similar appraisal. There is no viability without sufficient data, no matter how primitive the statistical analysis.

Respectfully yours,

Roy C. Schaeffer, MAI

RHODE ISLAND
DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

235 Promenade Street, Providence, RI 02908-5767 TDD 401-831-5508

Division of Planning and Development
Telephone (401) 222-2776, extension 4307
Fax (401) 222-2069
e-mail lprimian@dem.state.ri.us

June 11, 2002
Stone Ridge Inc.
c/o Mr. Charles Fogarty
130 Dye Hill Road
Hopkinton, RI 02833

RE: Property in Hopkinton, 130 Dye Hill Road

Dear Mr. Fogarty:

Enclosed please find a copy of the appraisal report of the aforementioned property for your review. As you know, the RIDEM Land Acquisition Committee will be meeting next Wednesday, June 19th to discuss this project.

I will contact you after the meeting to let you know how the Committee would like to proceed. If you have any questions or comments, please call me anytime. Thank you.

Sincerely,

Lisa Primiano, Supervisor
Land Conservation &
Acquisition Program

cc: Robert Sutton

*NCRA Center for Valuation Services*

P.O.Box 8676, Warwick, Rhode Island 02888
Message and Fax Center (401) 785-0878
Roy C. Schaeffer, MAI

July 8, 2002

Mr. Charles Fogarty
Dye Hill Road
Hopkinton, RI

RE: Appraisal of Reserve at Brushy Brook

Dear Mr. Fogarty:

In 2001, Mr. Houle and myself appraised a multi faceted property in Hopkinton, RI, known as the Reserve at Brushy Brook. It is to consist of an 18-hole golf course with full clubhouse amenities, a 66 lot detached, single-family housing development and a 68 unit condominium complex. Peter Scotti and Associates subsequently appraised the project. As you know, that appraisal presented a much lower value ($3,675,000) than the value that was the final opinion of our report ($9,000,000). As you requested, I have reviewed the Scotti report; the following are my findings.

**Data:** The appraisal approached 100 pages in length, despite having almost no real data. This is remarkable. Consider the following:

*Golf Course Sales Data*: The appraiser used only four sales. Two of these were not comparable, being nine-hole courses. A third sale occurred about five years ago, in the ashes of the real estate recession (1997). The remaining sale was an 18-hole golf course, to be sure, but was a "par-three" course, a significant limitation to the marketability and a serious difference in terms of comparison. Therefore, the only "standard" course sale used for comparison occurred in 1997. One need not be a golfer to come to the conclusion, that, for all practical purposes, the appraiser had no real data whatsoever in his report. Thus, the estimates descending from his analysis are spurious, at best.

The same complaint occurs when dealing with land purchased for construction of a golf course. Sale #1 was consummated in 1997, five years ago. Sale #2 occurred even earlier- 1996. Sale #3 transferred in the midst of the recession- 1993. There is no evidence, certainly from reading the report, to indicate that any of those properties were ever completed as golf courses. In fact, sale #3 is currently being developed, but has changed ownership so many times that the sale in 1993 is totally irrelevant.

Again, the data is not relevant. We had in our report several sales of more comparable golf course sales, although a sale of a course in Bellingham, Massachusetts

had unconfirmed selling data. Since the time of the report, we have been able to confirm the data. Everything we have learned since supports our original numbers, giving strength to our final estimate of value.

For example, the property consisted of about 329 acres of land, of which 118 acres were allocated to the golf course, which includes a 7,500 sf driving range structure. The remaining 211 acres were available for single-family development. Thus, this sale closely resembles the configuration of the subject property. *This property sold in 2000 for $9,200,000.*

We have also learned of a sale in Hopkinton, Mass. This was an 18-hole course that had a clubhouse. This was razed and replaced with a 15,000 sf clubhouse, swimming pool and a cabana facility with a tennis pavilion. *The sale price, without the proposed improvements was $7,500,000.* It occurred only six months ago, in December 2001.

In addition, we have learned of a sale of a raw site, approved for golf course development that recently transferred in Hudson, Mass., for $3,000,000. We have incomplete data regarding what was actually transferred, but it would appear to give overwhelming support to our contention of value for the approved gold course site contained in the subject property. Our estimate was under $2,000,000.

At this point, one can state that the golf course, upon completion, will be worth considerably more that the $2,700,000 estimate reached in the Scotti report. Scotti's estimate as completed, is lower than the undeveloped site sale in Hudson, Mass. In fact, there is a confusing element in Scotti's report, which shows a development cost of $3,500,000 for the golf course, $800,000 more than the completed value of $2,700,000. This is not resolved in the report.

*Single family subdivision*: Given the "hot" real estate market in the past three years, there should be more data than one could wish for. In fact, the appraiser states that lot sales in Hopkinton averaged 45 sales per year over the last 10 years. Nevertheless, the appraiser used only 3 sales to support hie estimate of sell-out. I think a summary of all South County sales would have been more convincing.

Put differently, the use of only 3 sales in an active market leaves us with an unconvincing estimate of market value. Our "scan" of sales showed much higher lot sales prices in this area of Rhode Island. There is no point in going further with the critique, since there is such a dearth of qualified information from which to draw an accurate conclusion.

*Condominium Land*: The same is true for this phase of the appraisal. Again, in the appraisal, there are only 3 sales of land with condo permits, and two of those sales involved the same buyer, effectively leaving use with only two sales. It is interesting that the appraiser made adjustments averaging 40%. A loan underwriter, faced with 40% total adjustments, would balk at approving any appraisal.

Finally, any discussion of current moratoriums on new construction, several of which are in place in South County is lacking. This, in our opinion, is a major issue, as it limits the appeal and feasibility of raw land tracts to be used for development. The subject has all approvals in place and these are exempted from any moratorium, meaning that a developer could start now, without any limitations.

In summary, we can only dismiss the appraisal as being unsupported, since too many sales have been overlooked or dismissed. Further, any discussions of rapid appreciation or building moratoriums is limited. In other words, the scant data precludes a detailed analysis of this or any similar appraisal. There is no viability without sufficient data, no matter how primitive the statistical analysis.

Respectfully yours,

Roy C. Schaeffer, MAI

PETER M. SCOTTI ASSOCIATES • REAL ESTATE

# Condensed Appraisal

358 Acres - Vacant Land
Dye Hill Road
Hopkinton, Rhode Island

Prepared For

Mr. Thomas W. Tavenner, Esq.
General Counsel
Realty Financial Partners
40 Williams Street, Suite 120
Wellesley, Massachusetts 02482

Prepared By

Ann M. Hollands, MAI
Appraiser
Peter M. Scotti & Associates
246 Hope Street
Providence, Rhode Island 02903

## Table of Contents


| | Page No. |
|---|---|
| Letter of Transmittal | 3 |
| Certification | 5 |
| Contingent & Limiting Conditions | 6 |
| Summary of Appraisal | 8 |
| Purpose of the Appraisal | 9 |
| Exposure Time | 9 |
| Scope of Appraisal | 10 |
| Taxes & Assessment | 11 |
| Zoning/Land Use | 11 |
| Flood Zone | 12 |
| Identification of the Real Estate | |
| Ownership & Sale History | 12 |
| Easements/Encroachments & Restrictions | 13 |
| Environmental | 13 |
| | |
| Location Summary | 14 |
| Rhode Island Overview | 15 |
| Hopkinton | 18 |
| Locus Map | 20 |
| Property Description | 20 |
| Subject Photographs | 22 |
| Topography Map | 24 |
| Plat Map | 25 |
| | |
| Highest & Best Use | 26 |
| Valuation | 28 |
| Comparable Sales | 29 |
| Discounted Cash Flow Analysis | 34 |
| | |
| Reconciliation and Value Estimate | 40 |
| | |
| Addenda | |
| Qualifications | |

PETER M. SCOTTI ASSOCIATES • REAL ESTATE

246 Hope Street

Providence, RI 02906

Tel 401.421.8888

Fax 401.331.3018

885 Boston Neck Road

Narragansett, RI 02882

Tel 401.782.8803

May 1, 2007

Mr. Thomas W. Tavenner, Esq.
General Counsel
Realty Financial Partners
40 Williams Street, Suite 120
Wellesley, Massachusetts 02482

**RE: Condensed Appraisal**
**358 Acres – Vacant Land**
**Dye Hill Road**
**Hopkinton, Rhode Island**

Dear Attorney Tavenner:

At your request, we have analyzed the subject property for the purpose of estimating the Market Value of the Fee Simple title. The property consists of Lots 69, 70 and 71 on Hopkinton's Tax Assessor Plat 32 and contains 358± acres/15,594,480± SF; and it is located on the north side of Dye Hill Road.

The property is vacant land which was approved for a planned unit development (PUD) consisting of 66 single-family home sites, 68 condominium units, and an 18-hole golf course.

It is important to note that in February of 2007 this office appraised a portion of the property, 289± acres, for the Rhode Island Department of Environmental Management. They were contemplating acquiring the land to assemble with their adjacent property, the Arcadia Management Area.

Pursuant to the terms of engagement, this is a Complete Appraisal reported in a summary format. The attached Certification, Contingent Assumption and Limiting Conditions and Special Limiting Conditions, if any are integral to this appraisal and report and should be understood by all of the intended users.

The condition upon which this appraisal is being made is "as is" and the effective date of the appraisal is the date of the last property inspection, May 5, 2007. Based upon the analyses and conclusions herein and our appraisal files, we conclude that the estimated Market Value of the Fee Simple interest in the property described herein, as of May 5, 2007, is:

INDICATED VALUE

Respectfully submitted,

Ann M. Hollands, MAI
License #A00211G

Peter M. Scotti, MAI
License #A00110G

## Certification

1. Ann M. Hollands, MAI, inspected the property (perimeter only) on February 7, 2007 and May 5, 2007.
2. We have no present or contemplated future interest in the subject property.
3. We have no personal interest or bias with respect to the subject of this report or the parties involved.
4. Our fee is not contingent upon reporting a predetermined value or conclusion with regard to the subject property.
5. This report sets forth all of the special and limiting conditions affecting its analyses, opinions and conclusions.
6. No one other than the undersigned performed the analyses, conclusions and opinions set forth herein.
7. This assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.
8. To the best of our knowledge, statements of fact contained herein are true and correct.
9. As of the date of this report Peter M. Scotti, MAI and Ann M. Hollands, MAI have completed the requirements of the Continuing Education Program of the Appraisal Institute.
10. This appraisal has been prepared in compliance with the Appraisal Institute's Standards of Professional Practice and the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. It is subject to review by members and designates of the Appraisal Institute.

Based upon the analyses and conclusions herein and our appraisal files, we conclude that the estimated Market Value of the Fee Simple interest in the property described herein, as of May 5, 2007, is:

INDICATED VALUE

Respectfully submitted,

Ann M. Hollands, MAI
License #A00211G

Peter M. Scotti, MAI
License #A00110G

## CONTINGENT & LIMITING CONDITIONS

This appraisal report, the Letter of Transmittal and the Certification of Value are made expressly subject to the following assumptions and limiting conditions and any special limiting conditions contained in the report which are incorporated herein by reference.

1. The legal description used in this report is assumed to be correct.

2. Sketches in this report are included to assist the reader and no responsibility is assumed for accuracy. No survey has been made of the property specifically for this report.

3. No responsibility is assumed for matters legal in nature, nor is any opinion rendered as to title, which is assumed to be good and marketable. The title is assumed to be held in fee simple.

4. Information, estimates and opinions furnished by others in this report were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy was assumed by this appraiser.

5. All mortgages, liens, encumbrances, leases, and servitudes have been disregarded unless so specified within this report. The property is appraised as though under responsible ownership and competent management.

6. Subsurface rights (minerals and oil) were not considered in making this appraisal.

7. It is assumed that there are no hidden or unapparent conditions of the property, subsoil or structures which would render it more or less valuable. No responsibility is assumed for such conditions nor is the appraiser responsible for arranging engineering, which might be required to discover such factors.

8. It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal report.

9. It is assumed that all required licenses, consents, or other legislative or administrative authority from any local, state, or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

10. It is assumed that the utilization of the land and improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted within this report.

11. Unless arrangements have been previously made, no appearances in court or requirements to give testimony in respect to the subject property will be assumed by the appraiser.

12. Possession of this report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purposes by any person other than the person to whom it is addressed without the written qualification and only in its entirety.

13. The distribution of the total valuation in this report between land and improvements applies only under the highest and best use of the subject property. The separate valuations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

14. Neither all nor any part of the contents of this report, or copy thereof, shall be used for any purpose by anyone but the client, without the previous written consent of the appraiser and/or client; nor shall it be conveyed by anyone but the client to the public through advertising, public relations, news, sales or other media without the written consent and the approval by the author(s), particularly as to valuation conclusions, the identity of the appraiser or a firm.

15. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. We urge the client to retain an expert in this field if desired. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

16. On January 26, 1992, The Americans with Disabilities Act (ADA) became effective. The Act requires compliance based on each property owner's financial ability with regard to the cost to cure the property's potential physical characteristics. Given that compliance is dependent upon the specific financial ability of each owner as determined by the U.S. Justice Department, it is not possible for the appraiser to comment on either current or potential adherence to the act or its impact on value. Consequently, a specific survey or analysis of the property to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines has <u>not</u> been undertaken.

## Summary of Appraisal

| | |
|---|---|
| Property Type: | Vacant Land |
| Property Address: | 130 Dye Hill Road<br>Hopkinton, Rhode Island |
| Property Owner: | Boulder Brook Development, LLC |
| Assessor's Identification: | Plat 32/Lots 69-71 |
| Property Interest Appraised: | Fee Simple |
| Value Appraised: | Market Value |
| Effective Date of Appraisal: | May 5, 2007 |
| Property Description: | 360± acres of vacant land located on the northerly side of Dye Hill Road just east of the intersection with Kenny Hill Road in the northwest section of the town. The collective site has frontage on Dye Hill Road and is basically rectangular in shape. |
| Zoning: | RFR 80; 80,000 square feet minimum residential lot size. PUD preliminary approval for 18-hole golf course, 66 single family lots, and 68 condominiums. |
| Highest and Best Use: | As proposed for 18-hole golf course, 66 single family dwellings, and 68 condominiums. |

## Purpose of the Appraisal

The purpose of this appraisal is to estimate the Market Value of the Fee Simple Interest in the subject property. The function of this appraisal is to provide a value estimate to the client, so that they may analyze the property for business considerations. The condition upon which the appraisal is being made is "as is."

The intended use of the appraisal is to provide a value estimate to the client and the intended users of this appraisal are the client and those other appropriate users.

**Market Value** is defined as the most probable price in terms of money which a property should bring in an open -and competitive market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.

Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1) Buyer and seller are typically motivated;
(2) Both parties are well informed or well advised, and acting in what they consider their own best interest;
(3) A reasonable time is allowed for exposure in the open market;
(4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
(5) The price represents the normal consideration for the property, sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

.Rules and Regulations, Federal Register, Vol. 55, No. 165, Page 34696.

**Fee Simple**, defined is: an absolute fee; a fee without limitations to any particular class of heirs or restrictions, but subject to the limitations of eminent domain, escheat, police power and taxation. An inheritable estate.1

## Exposure Time

Implicit in the definition of Market Value is a presumed time period over which the subject property should have been exposed to the open market in order to achieve a sale. Based on comparable sale data, offerings of similar property and the appraisers' opinion regarding the marketability of the property (as vacant) it is expected that the property would have required about six-nine months of exposure time prior to the consummation of a hypothetical sale, that being the effective date of the appraisal.

---

Real Estate Appraisal Terminology (Boyce), Page 102 and 149, respectively.

The project sell-out period is projected at 5 years. This estimate is predicated on the property being actively marketed and at offering prices consistent with that which is derived herein.

## Scope of Appraisal

The scope of this appraisal encompasses the necessary research and analysis to prepare a report in accordance with the intended use of the appraisal, the Standards of Professional Practice of the Appraisal Institute, and the Uniform Standards of the Appraisal Foundation. In regards to the subject property, this involved the following:

1. The subject property was last inspected on May 5, 2007. The photographs were from the appraiser's file. The condition observed on the date of our last inspection is materially the same. The effective date of valuation is May 5, 2007. The date of the report is May 17, 2007.

2. Subject property data is based upon the inspection of the property as well as information provided by the property owner, i.e., *Conceptual Layout-Boulder Brook Plan*, dated December 2005 and drawn by Crossman Engineering, Inc. For purposes of this appraisal this information for the basis for our lot sizes, road costs, and is assumed accurate.

3. Area and district data is based on information obtained from several sources including the Rhode Island Department of Economic Development; the U.S. Bureau of the Census; the Federal Reserve Bank (Boston) and real estate periodicals such as the New England Real Estate Journal. Additional district information was obtained from the appraisers' files.

4. Brokers, appraisers, and developers considered knowledgeable of the subject market were queried on relative issues.

5. In developing approaches to value, market data was collected from several sources including local municipalities, the appraiser's files and discussions with real estate professionals knowledgeable of the market.

6. After assembling and analyzing the data all three recognized approaches to value were applied to the subject property and a final value reconciled.

## Competency Rule

Ann M. Hollands, MAI and Peter M. Scotti, MAI are certified Rhode Island appraisers whose experience, education and knowledge qualify them to competently complete this assignment.

## Taxes and Assessment

The property is assessed to Boulder Brook Development, LLC as follows:

| Plat/Lot | Land | Bldg. | Total | Taxes |
|---|---|---|---|---|
| 32/68 | $ 569,400 | $ - | $ 569,400 | $ 7,971.60 |
| 32/69 | $ 721,300 | $ 163,600 | $ 884,900 | $ 12,388.60 |
| 32/70 | $ 292,600 | $ - | $ 292,600 | $ 4,096.40 |
| 32/71 | $ 522,200 | $ - | $ 522,200 | $ 7,310.80 |
| | Total | | | $ 31,767.40 |

The 2006 tax rate in the Town of Hopkinton is $14.00 for every $1,000 of assessed value. The above assessment represents the results of revaluation that was completed in 2005 for the 2006 tax year.

## Zoning/Land Use

The subject is located in the RFR-80 (Rural Farming Residential) Zoning District. This zone is designed to preserve the area's rural character, to protect land now in farming, horticulture and forestry from haphazard encroachment and to guard the safety and health of residents of the area. This zone provides for low-density residential development and reserves land for farming and conservation.

Permitted uses in the RFR-80 zone include single-family, two-family, multi-family, and certain agricultural uses. Dimensional regulations that regulate development in the RFR-80 Zone are as follows:

| | |
|---|---|
| Minimum Lot Size: | 80,000 Square Feet |
| Minimum Lot Width/Frontage: | 225' Feet |
| Minimum Front Yard: | 60' Feet |
| Minimum Side Yard: | 40' Feet |
| Minimum Rear Yard: | 50' Feet |
| Maximum Lot Coverage: | 15% |

According to information gleaned from the Hopkinton Town Planner the property has previously received final approval for a planned unit subdivision consisting of 66 single-family home sites, 68 residential condominiums and an 18-hole regulation golf course.

On December 6, 2006 the owners (Boulder Brook Development) submitted a pre-application for a comprehensive permit for a major subdivision that would in effect change the previous development scenario. Their new proposal indicates a residential cluster style development and has eliminated the golf course. Under the new scenario there will be 66 single-family units and 68 town house units.

**Zoning is a legal matter beyond the scope of this appraisal and report. The client is advised to obtain qualified zoning counsel if required. This opinion is being offered only for purposes of valuation and should not be relied upon for any legal matters.**

### Flood Zone

The subject property is located in Zone C of Community Map Number 440028 0002B. Zone C is not a designated flood hazard area.



### Identification of the Real Estate

The subject property is situated on the north side of Dye Hill Road in the Town of Hopkinton, Rhode Island; and is adjacent to the Arcadia Management Area. It is further identified as Lots 69, 70, and 71 on Hopkinton's Tax Assessor Plat 32. The legal description of the property is contained in the Land Evidence Records of the Town of Hopkinton in Deed Book 425, Page 399.

### Ownership and Sale History

Investigation of the public records, more specifically, the Hopkinton Town Clerk's Office, reveals a sale that occurred on August 16, 2005. Stone Ridge Inc. (Grantor) conveyed the property to Boulder Brook Development, LLC, for $5,500,000. This transfer is recorded in Book 425, Page399.

Based on our previous appraisal of a portion of this property, there were discussions regarding the potential acquisition by RIDEM for a sizeable portion of the site (289± acres). The remaining 73± acres would be retained by the owner for future development. The price and terms of the sale were not established, nor do we know the current status of these negotiations.

### Easements, Encroachments and Restrictions

We did not discover any evidence of easements, encroachments, or restrictions that would materially affect the value or marketability of the subject property.

### Environmental

No information was provided to the appraiser regarding the environmental status and condition of the property. The appraiser therefore recommends that an environmental assessment be made of the property in order to determine if there is any cause for concern in this regard. This valuation and report does not consider the impact that may result from an adverse environmental report of the property.