**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF RHODE ISLAND**

In re:

BRUSHY BROOK DEVELOPMENT CO., LLC
Debtor

BK 05-13009
CHAPTER 7

**OBJECTION OF CREDITORS JAMES OTTENBACHER AND CHARLES FOGARTY TO JOINT MOTION FOR ENTRY OF CONSENT ORDER**

Creditors James Ottenbacher and Charles Fogarty ("Objecting Creditors") object to the Joint Motion for Entry of Consent Order filed on January 25, 2008.[1]

According to the Promissory Note which is attached as Exhibit A (the "Note"), Boulder Brook Development Co., LLC ("Boulder Brook") borrowed $2,500,000.00 from LR6-A, Limited Partnership ("LR6-A, L.P.") on August 16, 2005. The Note provides for "base interest" at the rate of 21% per annum compounded monthly[2] and "additional interest" in the amount of $1,250,000.00 as the minimum interest to be earned during the one year term of the Note.[3] The Note is secured by a first position mortgage against real estate located to 163 Dye Hill

---

[1] *See* Claims Register, claim nos. 11 and 12. Additionally, Mr. Ottenbacher is owed approximately three hundred thousand dollars by Stone Ridge, Inc. which would receive any surplus funds from the Brushy Brook estate assuming all creditors in the latter estate were paid in full.

[2] *See* Note, paragraph 3.1.

[3] *See* Note, paragraph 3.2.

Road, Hopkinton, Rhode Island commonly known as the Reserve at Brushy Brook ("Real Estate").

In addition to the indebtedness to LR6-A, L.P. Boulder Brook is indebted to Brushy Brook in the approximate amount of $3.2 million. Brushy Brook's claim against Boulder Brook is secured by a second position mortgage against the Real Estate. However, Brushy Brook's mortgage on the Real Estate is subordinated to that of LR6-A, L.P. to the extent of $9 million. An additional provision of this second mortgage is that "THE PAYER SHALL NOT, WITHOUT THE PRIOR WRITTEN CONSENT OF THE SENIOR CREDITOR, HAVE ANY RIGHT TO ACCELERATE THE MATURITY OF, OR INSTITUTE ANY PROCEEDINGS TO ENFORCE, ANY INDEBTEDNESS EVIDENCED BY THIS NOTE." (Emphasis original.)

Under the proposed Consent Order, simple interest would be paid on the principal amount of the Note, $2,500,000.00, at a rate of 18% per annum. This amounts to interest of $450,000.00 per year. At that rate, as of May 15, 2008[4] the total sum due on the Note for principal and interest would be approximately $3,737,500.00 exclusive of the legal fees and other costs of collection which the Trustee proposes to allow to be paid.[5] The

[4] It appears that if the compromise is allowed and the proposed Consent Order entered, a closing will not logistically be able to occur before May 16, 2008 and more likely after that date.

[5] *See* Consent Order, ¶3. No estimate of the amount of the fees and charges has been given.

Objecting Creditors do not believe that at a foreclosure sale the price paid for the Real Estate will exceed the principal, interest, legal fees and costs which the Trustee proposes to allow to be paid on the Note. Therefore, Brushy Brook's claim of approximately $3.2 million against Boulder Brook will be rendered unsecured and worthless for all practical purposes.[6]

In addition to the exorbitant rate of interest, the Note has two further provisions which bear on the matter before the Court: first, LR6-A, L.P. has recourse only against the borrower, Boulder Brook and not against any of the principals of Boulder Brook[7] and, second, it contains a so-called "savings clause" which states in essence that if any court were to determine that the loan violated any usury law, all interest in excess of the applicable legal rate would be credited against the principal balance of the Note so as to bring the actual interest charged within the legal limit.[8]

---

[6] Given this outcome and the uncertain status of the development at the Real Estate is appears plausible that the sale of the Real Estate and the structure of the financing was no more than a "loan to own" scheme or a concerted effort to deprive Brushy Brook of any equity it had in the Real Estate at the time of its sale.

[7] *See* Note, paragraph 10.

[8] *See* Note, paragraph 11.

The Massachusetts statute regarding maximum interest rates[9], M.G.L. c. 271, §49, is entitled "Criminal Usury". Subparagraph (a) of that section provides for a maximum interest rate of 20% per annum and further states that a person loaning money at a rate greater than 20% per annum

> ... shall be guilty of criminal usury and shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than ten thousand dollars, or by both such fine and imprisonment.

*See* M.G.L. c. 271, §49(a). The statute further provides that

> [a]ny loan at a rate of interest proscribed under the provisions of paragraph (a) may be declared void by the supreme judicial or superior court in equity upon petition by the person to whom the loan was made.

*See* M.G.L. c. 271, §49(c).

The Massachusetts statute also contains an exculpatory clause which states that the provisions noted above

> ... shall not apply to any person who notifies the attorney general of his intent to engage in a transaction or transactions which, but for the provisions of this paragraph, would be proscribed under the provisions of paragraph (a) providing any such person maintains records of any such transaction. Such notification shall be

---

[9] Despite the fact that the Real Estate is located entirely in Hopkinton, Rhode Island, the borrower is a Rhode Island LLC and the principals of the LLC are residents of Rhode Island, the parties stipulated that the loan transaction was subject to the laws of the Commonwealth of Massachusetts. *See* Note, paragraph 13.4.

> valid for a two year period and shall contain the person's name and accurate address.

*See* M.G.L. c. 271, §49(d). Thus, if a person **properly** notifies the Attorney General of the Commonwealth of Massachusetts of the transaction, the 20% limit imposed by M.G.L. c. 271, §49(a) does not apply to the interest or other charges which can be charged on a loan.

A proper construction of the criminal usury statute referred to above indicates that a lender may charge an annual interest rate in excess of 20% if notice is provided to the Attorney General in either of two ways: first, an individual letter describing each separate transaction can be sent to the Attorney General ("... any person who notifies the attorney general of his intent to engage in a transaction ..."); or, second, a letter can be sent to the Attorney General stating the lender's intention to engage in multiple transactions over a two year period ("... any person who notifies the attorney general of his intent to engage in ... transactions ..."). Those are the two options: a transaction specific notice or a general notice. In the case involving the loan to Boulder Brook, the lender, LR6-A, L.P., did not provide either a general or specific notice and in failing to do so, committed criminal usury.

In an attempt to "legitimize" or "decriminalize" its actions, LR6-A, L.P. proffered a letter which relates to a

totally separate transaction as meeting the requirements of the statute.[10] This letter dated August 12, 2005 from a law firm which had no connection with the Boulder Brook transaction, references a loan to Conant Crossing, LLC and Conant Land Investment, LLC.[11] This Conant letter has nothing to do with the Boulder Brook transaction. It is neither a transaction specific notice of the Boulder Brook loan nor is it a general notice. Hence, the Conant letter does not exculpate the Boulder Brook transaction from the Massachusetts statute relating to criminal usury.

While the Rhode Island usury statute provides that a loan made in violation of its terms is automatically void, the Massachusetts statute provides a different and discretionary remedy.

> It was within the discretion of the judge, based upon all the facts, circumstances, and conditions surrounding the loan, to void it, to rescind it, to refund, to credit any excessive interest paid, to reform the contract, or to provide any other relief consistent with equitable principles.

Beach Assocs., Inc. v. Fauser, 9 Mass. App. Ct. 386, 394, 401 N.E.2d 858, 863-64 (1980).

---

[10] A copy of the letter is attached as Exhibit B.

[11] LR6-A, L.P. has admitted that this is a separate loan to a separate third party not connected to the Boulder Brook transaction.

The proposed Consent Order would allow LR6-A, LLC[12] to be paid almost $4,000,000.00 and does nothing more than give LR6-A, LLC a settlement which is equivalent to the best result that it could achieve were the issue of usury litigated. Additionally, there are other causes of action which relate to the usury issue which are not dealt with by the proposed Consent Order.[13] In In re Tavares, 298 B.R. 195, 203 (Bankr.D.Mass.2003), Bankruptcy Judge Feeney held that

> [b]ecause the usury statute appears in Chapter 271 of the General Laws, denominated "Crimes Against Public Policy", the Court finds irrefutable the Debtor's position that a violation of G.L. c. 271, §49 would constitute a violation of G.L. c. 93A, §2, if her interpretation of §49 is correct.

A violation of G.L. c. 93A could result in an award of double or treble damages and attorney's fees. *See* G.L. c. 93A, §9.[14]

In addition to the violations of the Massachusetts Criminal Usury Statute and chapter 93A of the Massachusetts General Laws, LR6-A may well have violated the Federal Racketeer Influenced

---

[12] LR6-A, L.P. subsequently assigned the Note to LR6-A, LLC on or about September 21, 2005 and, in an attempt, as previously argued, to again "legitimatize" or "decriminalize" the actions previously taken, issued a new letter to the Massachusetts Attorney General. A copy of the new letter is attached as Exhibit C.

[13] The Joint Motion for Entry of Consent Order is in the nature of a motion to compromise. *See* Fed.R.Bankr.P. 2002 and 9019.

[14] Regulation of Business Practices for Consumer Protection, M.G.L. c. 93A, §§ 1, *et seq.*

and Corrupt Organizations Act. *See* 18 U.S.C. §§ 1962, *et seq.* That Act provides that

> [i]t shall be unlawful for any person ... through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate ... commerce.

18 U.S.C. §1962(b). "Unlawful debt is defined as one

> ... which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with ... the business of lending money ... at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

11 U.S.C. §1961(6). The legal rate set by G.L. c. 271, §49(a) is 20%. A loan for one year in the amount of $2,500,000.00 with minimum interest of $1,250,000.00 is more than twice the legal rate of 20% per annum. The Federal RICO Act provides for both criminal penalties, 18 U.S.C. §1963, and civil remedies of treble damages and attorney's fees, 18 U.S.C. §1964(c).

Given this range of possible remedies, it is unreasonable to allow LR6-A, LLC to recover its principal plus 18% interest and costs and attorney's fees. The total amount which LR6-A, LLC would recover pursuant to the proposed Consent Order likely approximates the full value of its collateral. The estate stands to recover little if anything on account of its $3.2 million

note and second mortgage against the Real Estate. At the same time, LR6-A will likely recover almost $1.5 million over the principal amount of its investment.

The Objecting Creditors do not deny that there are hurdles facing the Trustee in his assertion of his usury and related claims on behalf of Brushy Brook. The Objecting Creditors believe, however, that since there will be likely no recovery for the estate if the foreclosure sale proceeds, litigating the issue of usury would be in the best interest of the estate.

A discussion of the issues which the Objecting Creditors believe are facing the Trustee in order for him to be successful[15] on his claims follows:

***1. Standing of the Trustee to Assert Usury Claims***

Following the Trustee's initial allegations concerning usury, LR6-A, LLC claimed that the Trustee had no standing to assert usury claims on behalf of Brushy Brook. In response, the Trustee commenced an involuntary bankruptcy proceeding against

[15] The Objecting Creditors believe that LR6-A's violation of Massachusetts' criminal usury statute is clear. The issues which confront the Trustee relate to defenses which are likely to be raised by LR6-A, LLC.

Boulder Brook[16] which obviously has standing to assert the usury claims relating to this transaction.[17] No hearing has yet been held on the involuntary petition.

Notwithstanding the involuntary bankruptcy of Boulder Brook, the Objecting Creditors believe that the Trustee has independent standing to challenge the legality of the Note. Although there are no Massachusetts Supreme Judicial Court or Appeals Court decisions on point, there is an opinion from the Massachusetts Superior Court which provides that a junior lien holder has standing to invoke the protections of the criminal usury statute to challenge whether a senior encumbrance is usurious.

In LBM Financial, LLC v. Edgewater Investment, L.P., 18 Mass. L. Rep. 226, 2004 Mass. Super. LEXIS 327 (2004)[18], KOC, a junior mortgagee, contended its claim entitled to priority over a senior mortgage which it argued was usurious. The senior

---

[16] Prior to the institution of the involuntary bankruptcy, a declaratory judgment action was filed by LR6-A, LLC in the Suffolk County Superior Court in the Commonwealth of Massachusetts seeking a determination that the loan in question was valid. That suit has been stayed by the involuntary bankruptcy filing against Boulder Brook.

[17] The Objecting Creditors believe, although they do not have a copy of the document, that the personal guarantees signed by Boulder Brook's principals do not commit them to personal liability unless they challenge the legality of the Note.

[18] A copy of the Opinion is attached as Exhibit D.

mortgagee argued that KOC had no standing to contest the validity of its note and mortgage. The court concluded that

> [t]he short answer to this issue is that a junior attaching creditor who stands to gain surplus proceeds has standing to contest the validity of a senior note and mortgage.

(Slip.Op. at 3). The court went on to state that

> [s]ubsection 49(c) cannot fairly be read to preclude a challenge to the loan by KOC. As noted above, KOC is generally entitled to standing as a junior attaching creditor. Surely the public policy interests of the usury statute are furthered by KOC's present claim. It remains for trial whether the loan is reformed or is declared void.

(Slip.Op. at 4). The Objecting Creditors believe that the Trustee, as holder of a junior mortgage, has standing to challenge the usurious LR6-A, LLC Note.

***2. Savings Clause***

Likewise, the Trustee may face the argument that the savings clause, so-called,[19] precludes any recovery by him. Again, while there are no opinions of the Supreme Judicial Court or the Massachusetts Appeals Court directly on point involving the usury statute, there is again a Superior Court rescript opinion on point in a case involving another Realty Financial

---

[19] *See* note, paragraph 11.

Partners' entity.[20] In that case, the defendants had given releases in forbearance agreements into which the parties had entered. The Superior Court noted that

> [e]ach of these two forbearance agreements included broadly worded release language running from the Meadow Creek Group to the LR5-A Group purporting to release LR5-A from any and all prior obligations and default.[21]

The Court framed the

> ... first contested issue is whether claims under the Criminal Usury Statute can be released by agreements of the potential claimants such as is argued by the LR5-A Group with respect to the release language in the forbearance agreements.[22]

After reviewing various cases and the public policy arguments involved, the Court concluded that

> ... the release language in the two forbearance agreements does not eviscerate or bar the claims under G.L. c. 271, §49.[23]

The Superior Court determined that the public policy of the Commonwealth does not allow a contractual release to bar claims made under the usury statute. The Court noted a prior opinion of the Supreme Judicial Court when it stated

---

[20] LR5-A, L.P. v. Meadow Creek, LLC, et al, No. 06-2804 BLS (Suffolk County Superior Court, October 17, 2006). A copy is attached as Exhibit E.

[21] Slip.op. at 2.

[22] Slip.op. at 3.

[23] Slip.op. at 5.

> [w]here a statute "rests upon grounds of public policy, it is not the power of one who may be directly affected by it to contract in advance that it may be disregarded."[24]

The usury statute is one of public policy. *See* Begelfer v. Najarian, 381 Mass. 177, 185, 409 N.E.2d 167, 172 (1980) ("The public policy against usury is clearly a matter for grave legislative concern ..."). In tandem with the public policy embodied within the statute, it is imperative to remember that violation of the statute is criminal. M.G.L. c. 271, §49 is entitled "Criminal Usury" and states that parties who violate the statute

> ... shall be guilty of criminal usury and shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than $10,000.00, or by both such fine and imprisonment.

M.G.L. c. 271, §49. *See* In re Waitz, 416 Mass. 298, 299, 621 N.E.2d 1166, 1167 (1993) (Denying an attorneys' petition for reinstatement to the bar following his conviction for criminal usury). Here, the savings clause attempts to avoid responsibility for non-compliance with the statute not only in a civil matter but also in the statute which has criminal penalties. Any such attempt to avoid possible criminal responsibility by contract between two private parties is

[24] Slip.op at 4 citing Beacon Hill Civic Ass'n. v. Ristorante Toscano, Inc., 422 Mass. 318, 324 (1996).

clearly against public policy. Because a contract cannot "uncommit" a crime, the savings clause provides no safe haven for LR6-A, LLC.

### *3. Possible Remedies*

The fact that the Trustee may establish usury does not yet result in a recovery to the estate. The Massachusetts statute states that when there is a violation, the loan "... may be declared void by the supreme judicial or superior court in equity upon petition by the person to whom the loan was made." M.G.L., c. 271, §49. The Massachusetts courts have noted that

> [t]he appropriate remedy in any particular case is arrived at by balancing a number of factors including the importance of the public policy against usury, whether a refusal to enforce the term will further that policy, the gravity of the misconduct involved, the materiality of the provision to the rest of the contract, and the impact of the remedy on the parties' rights and duties.

Begelfer v. Najarian, 381 Mass. at 189, 409 N.E.2d at 175. *See also* In re Tavares, 298 B.R. 195, 204 (Bankr.Mass.2003) (stating, "[i]t was within the discretion of the judge, based upon all the facts, circumstances and conditions surrounding the loan to void it, to rescind it, to refund, to credit any excessive interest paid, to reform the contract, or to provide any other relief consistent with equitable principles." Citing

Beach Assocs., Inc. v. Fauser, 9 Mass. App. Ct. 386, 394, 401 N.E.2d 858 (1980)).

There are simply too many unanswered questions in this case for the Objecting Creditors (or the Trustee) to determine what the potential remedy would be if the Note is found to be usurious. Since the remedy to be imposed depends on the facts and circumstances of a particular transaction, the facts and circumstances concerning the transaction must be fully understood before the potential remedies are waived. Some of the issues which may bear on the potential remedy and merit further inquiry are described below.

Ralph Palumbo, a certified public accountant who had done financial and tax work for both Stone Ridge, Inc. and Brushy Brook for many years, turned out to be a 50% owner of Boulder Brook, the entity which purchased the land from Brushy Brook. He was privy to supposedly private discussions and communications among the principals of Brushy Brook while he was an undisclosed principal of Boulder Brook. His ownership interest in Boulder Brook was not disclosed to any of the principals of Brushy Brook prior to the transaction taking place.[25]

[25] As the Court is well aware from the contentious hearings in the involuntary bankruptcy proceeding of Brushy Brook, the members rarely agreed on anything. The one thing upon which they all agree is that Mr. Palumbo's involvement in Boulder Brook was not disclosed to any of them prior to the sale of the real estate to Boulder Brook.

Next is the question of why Boulder Brook and its principals would borrow money for one year at a 50% interest rate. A letter[26] from Mr. Savage, a 50% owner of Boulder Brook, refers to using the Realty Financial Partners loan for "bridge financing". It seems a very expensive proposition to give away $1,250,000.00 of equity in a real estate venture to borrow $2,500,000.00 for one year. No doubt the fact of there being no personal liability on the note was a factor, but the prior relationships between the principals of Boulder Brook and the principals of Realty Financial Partners has not been disclosed.

Additionally, affiliates or subsidiaries of Realty Financial Partners are defendants in similar litigation in the Massachusetts state courts. *See* LR5-A, L.P., Plaintiff v. Meadow Creek, LLC, Premier Homes, Inc. and Frederick P. Fahey, Defendants v. LR5-A Corp., Realty Financial Partners V, L.P., Realty Financial Partners V, Inc., David Allen, Joseph L. McCarron, Thomas W. Tavenner, Third Party Defendants, Suffolk County Superior Court, C.A. Docket No. 06-2804, BLS. It appears that the number of similar violations of the Massachusetts Criminal Usury Statute would have a bearing on what remedy the Court would find appropriate for the violation here.

[26] A copy is attached as Exhibit F.

## CONCLUSION

Based on all of the above, but especially on the fact that if the foreclosure is allowed to go forward as proposed in the Consent Order there will likely be no recovery for the estate and a full recovery for the entity which violated the Massachusetts Criminal Usury Statute, the Joint Motion for Entry of Consent Order should be denied.

By their Attorney,

/s/John Boyajian

John Boyajian, # 0919
Boyajian, Harrington & Richardson
182 Waterman Street
Providence, RI 02906
401-273-9600
401-273-9605 (Fax)

## CERTIFICATION

I hereby certify that a copy of the within Objection was mailed, postage prepaid to Akhil Patel, Esq., Thompson Hine, LLP, 10 West Broad St., Columbus, OH 43215; John McCoy, Esq., Carroll, Kelly & Murphy, One Turks Head Place, Ste 400, Providence, RI 02903; Division of Taxation, Bankruptcy Unit, One Capitol Hill, Providence, RI 02908 and electronically mailed to Thomas Carlotto, Esq. at tcarlotto@shslawfirm.com; Matthew McGowan, Esq. at mmcgowan@smsllaw.com; Vincent Indgelia, Esq. at vcindeglia@aol.com; Theodore Orson, Esq. at torson@orsonandbrusini.com; Stephen Brouillard, Esq. at sbrouillard@orsonandbrusini.com; Peter Furness, Esq. at pjf@sfclaw.com; Charles Pisaturo, Esq. at cpisaturo@earthlink.net; William Dolan, III, Esq. at wdolan@brownrudnick.com; John Tarantino, Esq. at jtarantino@apslaw.com; Denean Russo, Esq. at drusso@mwdglaw.com on February 29, 2008.

/s/Martha Hunt

BURNS & LEVINSON LLP

125 SUMMER STREET BOSTON, MA 02110
T 617-345-3000 F 617-345-3299
WWW.BURNSLEV.COM
CHAD J. PORTER

August 12, 2005

BY HAND

Attorney General's Office
One Ashburton Place
Boston, Massachusetts 02108

00512

Re: Notice Under M.G.L.c.271 §49(d)

Dear Sir or Madam:

Notice is hereby given pursuant to G.L. c. 271 §49(d) of the intention of LR6-A Limited Partnership (the "Lender") to make loans to Conant Crossing LLC and Conant Land Investment LLC (the "Borrower"). Interest and other charges payable by the Borrower with respect to such loans is not expected to, but may, when aggregated, exceed 20% per annum. The address of the Lender is Ten Post Office Square, Suite 750, Boston, MA 02109, and records relating to such loans shall be kept at such address.

Please acknowledge receipt of this notice by stamping the enclosed copy of this letter and returning it to the messenger delivering the same.

Sincerely,

Chad J. Porter, Esq.

cc: Thomas Tavenner

00149121

EXHIBIT
B
ALL-STATE LEGAL

RFP

REALTY FINANCIAL PARTNERS

10 Post Office Square · Suite 750 · Boston, MA 02109
617.896.4700, Fax: 617.896.4760

COPY

September 21, 2005

Department of Attorney General
Commonwealth of Massachusetts
Eighteenth Floor
John McCormick State Office Building
One Ashburton Place
Boston, Massachusetts 02108

Dear Sir/Madam:

Please be advised that LR6-A, LLC, a Massachusetts Limited Liability Company registered with the Commonwealth of Massachusetts, by and through its manager, LR6-A Corp., a Massachusetts corporation ("LR6-A"), intends to loan money for which loans it may contract for, charge, take and receive interest and expenses, in the aggregate of which may exceed an amount greater than twenty percent per annum upon the sums loaned. In additional to those items included such as interest and expenses pursuant to Section 49(a) of Chapter 271 of the Massachusetts General Laws, such interest may also include brokerage fees, commissions, development fees, financing fees, application fees, contingent interest, so-called, as well as fixed and variable interest and similar charges and premiums for prepayment and may be required or contracted between the Partnership and borrowers. LR6-A maintains a business office at 10 Post Office Square, Suite 750, Boston, Massachusetts 02109.

In accordance with the provisions of Section 49(d) of Chapter 271, LR6-A will maintain records of any transaction to which said Section 49 applies, which records will contain: (a) the name and address of the borrower; (b) the amount borrowed; (c) the interest and expense to be paid by the borrower; (d) the date the loan is made and (e) the date or dates on which any payment is due. Any such records will be available to you for the purpose of inspection upon request.

ALL-STATE LEGAL®
EXHIBIT
C

Department of Attorney General
Commonwealth of Massachusetts
September 21, 2005
Page Two

This letter is otherwise delivered to you in order to comply with the notice provisions under Section 49(d) of Chapter 271 of the Massachusetts General Laws. In order that we may have a record of filing this notice, we would appreciate having the enclosed copy of this letter date-stamped and returned to us in the enclosed self-addressed stamped envelope attached hereto.

Respectfully Yours,

LR6-A, LLC
By: LR6-A Corp., Manager

By:____________________
Name: David S. Allen
Title: President

1 of 2 DOCUMENTS

**LBM Financial, LLC v. Edgewater Investment Limited Partnership et al.**

**01-798, 01-656, 02-286**

**SUPERIOR COURT OF MASSACHUSETTS, AT BARNSTABLE**

**18 Mass. L. Rep. 226; 2004 Mass. Super. LEXIS 327**

**August 5, 2004, Decided**

**DISPOSITION:** Summary judgment granted in part and denied in part.

**JUDGES:** [*1] Gary A. Nickerson, Justice of the Superior Court.

**OPINION BY:** Gary A. Nickerson

**OPINION**

*MEMORANDUM OF DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT*

These actions arise out of a mortgage foreclosure sale of real estate known as the Half-Tide Marina in Mashpee, Massachusetts. The rigors of litigation have whittled the parties down to a few who now seek summary judgment as to the disposition of the foreclosure proceeds surplus. The cross motions for summary judgment were heard on December 19, 2003. [1]

1 The court apologizes for the delay in rendering this decision, but in partial defense notes that the Rule 9A bundles for the cross motions at hand (excluding the other pleadings filed in the four actions) are, when stacked atop one another, seventeen inches deep.

BACKGROUND

There are those in Mashpee who say the Half-Tide Marina is aptly named, for at low tide they claim there's not enough water to navigate out of the docks and down the Santuit River. Nonetheless, one can infer the spot has its charms for [*2] it has, in recent years, attracted a fair amount of investors.

During the year 2000, the then owner of the marina, Edgewater Investment Limited Partnership ("Edgewater"), obtained a loan in two installments totaling $ 400,000 from Willowbend Development Corporation ("Willowbend"). The loan was secured by a mortgage on the marina, recorded April 10, 2000. In the fall of 2000, Edgewater borrowed money from Citizens Bank. The funds took the form of two mortgages on the premises, the first for $ 610,000, the second for $ 200,000. Both Citizens mortgages went to record October 31, 2000, and, by a subordination agreement, took precedence over the Willowbend mortgage. By September 2001, the two Citizens mortgages were held by LBM Financial, LLC ("LBM").

A fourth mortgage on the premises was granted to Funding Services Trust ("Funding Services") to secure the $ 175,000 borrowed by Edgewater from Funding Services. The fourth mortgage was recorded on January 15, 2001. By all accounts, the Funding Services loan called for interest payments which were usurious under G.L.c. 271, § 49. Funding Services assigned its interest in the transaction to LBM. On May 10, 2001, LBM [*3] recorded a confirmatory mortgage of sorts, apparently in an effort to correct a deficiency in Funding Services' filing with the Attorney General pursuant to G.L.c. 271, § 49(d).

The Massachusetts State Counsel of the Knights of Columbus ("KOC") loaned $ 210,220 to either Edgewater or its principals and anticipated their promissory note would be secured by the assets of the marina including the real estate. KOC sued on the debt in the Norfolk Superior Court in January 2001 and promptly obtained an attachment against the Half Tide Marina which was

ALL-STATE LEGAL®
EXHIBIT
D

recorded on January 24, 2001. The Norfolk claim has since matured into a judgment.

Meanwhile, during 2000, Edgewater was busy marketing ninety-nine-year leases of dock space. Dr. Philip Dombrowski and his wife Jeannie Klibanoff-Dombrowski ("the Dombrowskis") purchased two boat slips under this leasing scheme for the total sum of $ 101,650. Their lease paperwork appears to have been finalized on January 10, 2001. Others "purchased" dock space, but they have not taken an active role in the litigation.

The first and second mortgages fell into arrears. On September 4, 2001, LBM conducted a mortgage foreclosure sale [*4] at the premises. The high bidder, Robert Bradley, carried the day with a bid of $ 1,550,000. Bradley assigned his right to purchase the premises to Timothy Leedham. The foreclosure sale was subject to a right of refusal held by Willowbend. Leedham secured Willowbend's assent and closed on the deal, paying to LBM the total of $ 1,550,000 on December 12, 2001. Attorney Michael J. Norris, counsel to LBM, assumed the role of escrow agent and continues to hold undisbursed sums.

Four suits were filed in the wake of the foreclosure auction. First was 01-656, filed by KOC on October 9, 2001. Next came 01-685, filed by the Dombrowskis on October 18, 2001. LBM filed an interpleader action, case 01-798, on December 21, 2001. The final action was filed on May 15, 2002, by KOC as case 02-286. On October 17, 2001, at the behest of KOC, this jurist entered a preliminary injunction prohibiting the disbursement of any sale proceeds absent further order of the court.

On January 18, 2002, the parties filed a written stipulation in case 01-798, agreeing to the disbursement of $ 691,994.19 [2] to pay in full the principal and interest through October 7, 2001 on LBM's first and second mortgages and further [*5] agreeing to the disbursement of $ 468,497.63 to pay in full the principal and interest for said period on Willowbend's third mortgage. On February 8, 2002, the court allowed the disbursement to LBM and on March 11, 2002, the disbursement to Willowbend was approved in the sum of $ 366,847.63. [3]

2 The stipulation contains a total figure of $ 731,994.09 for LBM, an addition error clear on the paper itself.

3 Between the filing of the stipulation and the court's endorsement, Willowbend and the Dombrowskis agreed to keep $ 101,650 of the $ 468,497.63 in escrow pending the resolution of the Dombrowskis' claim that Willowbend had agreed to subordinate its position to the Dombrowskis.

Cases 01-652, 01-798 and 02-286 have been consolidated for all purposes. Case 01-685 has been joined with the other three as to issues raised in 01-685 on the disbursement of the foreclosure sale surplus. The remaining issues in case 01-685 stand alone. The cross motions for summary judgment covered by this decision deal with the [*6] allocation of the foreclosure surplus.

## DISCUSSION

By their stipulation of January 18, 2002, the parties recognized the propriety of the first, second and third mortgages. No one reserved any rights to contest the validity of either the mortgages or the foreclosure sale. The only bone of contention remaining on January 18th was whether LBM and Willowbend were entitled to interest through the date of disbursement or only through October 7, 2001. Funds were disbursed to LBM in full satisfaction of the first and second mortgages' principal and interest through October 7th.

In the immediate wake of the stipulation of January 18th, Willowbend and the Dombrowskis agreed that Willowbend would receive only $ 366,847.63, reserving some $ 101,650 until the question of priority between Willowbend and the Dombrowskis was resolved. KOC entered no reservations. The $ 366,847.63 was disbursed to Willowbend. Only later, with the filing of case 02-286, did KOC contest the validity of the Willowbend mortgage. More time passed before KOC and the Dombrowskis launched their present challenge to the first and second mortgages.

By their stipulation of January 18th, KOC and the Dombrowskis are barred from [*7] contesting the validity of the first and second mortgages and the foreclosure sale. The stipulation called for the release of funds to LBM for expenses incurred by LBM in the course of the foreclosure sale together with all principal and interest through October 7, 2001, due on the first and second mortgage notes. "[A] party may not disregard a stipulation given by him, nor can he revoke or escape from it at his will." *Kalika v. Munro*, 323 Mass. 542, 543, 83 N.E.2d 172 (1948). Stipulations may govern, and

foreclose, substantive rights as well as procedural rights. E.g. *Loring v. Mercier*, 318 Mass. 599, 600-01, 63 N.E.2d 466 (1945); *Barron v. Fidelity Magellan Fund*, 57 Mass.App.Ct. 507, 510 fn.8, 784 N.E.2d 634 (2003). A stipulation must be fairly read. *Powers v. Secretary of Administration*, 412 Mass. 119, 123, 587 N.E.2d 744 (1992). Except for the question of interest post October 7th, the stipulation is, in effect, an unequivocal endorsement of the foreclosure sale and the validity of the LBM mortgages.

A trial court may vacate a stipulation that is improvident or not conducive to justice. *Kalika*, 323 Mass. at 542-43; *Loring*, 318 Mass. at 601. [*8] KOC never moved to vacate the stipulation. KOC now claims that information gathered in discovery leads KOC to challenge the sale and the validity of the mortgages. At best, KOC is asking this court to disregard the stipulation and accept the sinister inferences KOC has drawn from equivocal facts, facts which more reasonably support inferences in favor of the validity of the foreclosure sale and the mortgages. [4] There is no sound reason to vacate the stipulation. Compare with *Stewart v. Bass River Savings Bank*, 3 Mass.App.Ct. 574, 579, 336 N.E.2d 921 (1975).

4 At the hearing on the present motions, this jurist pressed counsel for KOC as to what remedy he sought: was he asking the court to vacate the foreclosure sale? Counsel had no cogent response.

For the same reasons, KOC is barred from now contesting the validity of Willowbend's third mortgage. KOC's current theories of conspiracy surrounding Willowbend's mortgage amount to naught. [5] While the Dombrowskis arguably reserved some claims against Willowbend, [*9] they are unable to litigate the same. When the motions at hand were argued, it appeared that the Dombrowskis were bound by the decision of the Court, Connon, J., in case 01-685 (pleading no. 36), wherein it was determined that the lease interest of the Dombrowskis was terminated by the foreclosure sale. In the interim, the Appeals Court has cast a shadow on the conclusive effect of Justice Connon's decision by ruling that it cannot be extended to the second amended complaint in case 01-685 absent a motion to dismiss directed toward the second amended complaint. The Appeals Court decision, rendered via Rule 1:28, finds no fault with the substantive content of Justice Connon's decision. To the extent that Justice Connon's decision addressed the Dombrowskis' Motion for Partial Summary Judgment (pleading # 27 in case 01-685), the decision presumably retains its vitality. This jurist has examined the substantive issue anew and adopts the reasoning of Justice Connon. The Dombrowskis' leasehold interest was extinguished when LBM foreclosed on the marina. See *Federal National Mortgage Association v. Therrian*, 42 Mass.App.Ct. 523, 524, 678 N.E.2d 193 (1997). Thus the Dombrowskis have no valid [*10] priority claim to the foreclosure sale proceeds.

5 Edgewater received the $ 400,000 loaned by Willowbend. KOC cannot now claim the mortgage was an ultra vires act by Edgewater. See *Valley Stream Teachers Federal Credit Union v. Commissioner of Banks*, 376 Mass. 845, 856, 384 N.E.2d 200 (1978).

KOC contends it is entitled to priority over the fourth mortgage as this mortgage is usurious. LBM, the holder of the fourth mortgage, disputes KOC's standing to contest the validity of the note and mortgage. The short answer to this issue is that a junior attaching creditor who stands to gain surplus proceeds has standing to contest the validity of a senior note and mortgage. *Kirk v. MacDonald*, 21 Mass.App.Ct. 21, 25, 483 N.E.2d 832 (1985).

All agree that the interest on the promissory note to Funding Services was usurious. The issue is whether Funding Services registered with the Attorney General under the provisions of G.L.c. 271, § 49(d) before making the loan. LBM proffers three letters [*11] to the Attorney General in support of proper registration, the first from Funding Services on March 1, 2000, the second from Funding Services on February 1, 2001, and the third from LBM on January 4, 2000. The Funding Services letters only refer to and hence only apply to "loans which were made in the past to third parties."

When Funding Services loaned Edgewater the money on January 15, 2001, there was no letter on file with the Attorney General to the effect that Funding Services would then be making usurious loans. Absent such a letter, the loan falls within the operation of G.L.c. 271, § 49, subsections (a), (b), and (c). *Levites v. Chipman*, 30 Mass.App.Ct. 356, 362, 568 N.E.2d 639 (1991); *Hakim Enterprises, Inc. v. Rembrandt*, 30 Mass.App.Ct. 911, 911, 566 N.E.2d 115 (1991); G.L.c. 271, § 49(d). Funding Services' letter of February 1, 2001 was too late. LBM's letter, while timely and proper in

form as it states a prospective intent to make usurious loans, is inapplicable as LBM did not make the loan. At best, LBM has no greater rights than Funding Services. *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 740, 729 N.E.2d 1113 (2000). [*12]

Section 49(c) of the usury statute permits the borrower to challenge a usurious loan by petitioning the Superior Court for equitable relief. A usurious loan is not a nullity per se under the statute. *Beach Associates, Inc. v. Fauser*, 9 Mass.App.Ct. 386, 392-93, 401 N.E.2d 858 (1980). The Court has broad powers to reform the note, void interest, set a lawful rate of interest and so forth. *Begelfer v. Najarian*, 381 Mass. 177, 188, 409 N.E.2d 167 (1980); *Beach Associates, supra*. Subsection 49(c) cannot be fairly read to preclude a challenge to the loan by KOC. As noted above, KOC is generally entitled to standing as a junior attaching creditor. Surely the public policy interests of the usury statute are furthered by KOC's present claim. It remains for trial as to whether the loan is reformed or is declared void. If void, then KOC has priority. If reformed, KOC stands behind the fourth mortgage.

The court is aware of no reason to deny the first and second mortgage holder its interest from October 7, 2001 until the date of disbursement, February 8, 2002. The rationale for limiting the interest to October 7, 2001 neither appears in the stipulation of the parties nor in their [*13] voluminous briefs. Apparently KOC would assent to only thirty days of interest as thirty days was historically the customary closing time under most memoranda of sale. *Real Estate Law*, Eno and Harvey, 28 MPS, § 10.13 fn.11 at pg. 240 (2001). There is no statutory time limit for the filing of an affidavit of foreclosure sale; G.L.c. 244, § 15. There is no equitable reason to deny LBM the interest owed from October 7, 2001 through February 8, 2002.

Willowbend stands in a slightly different position vis-a-vis the third mortgage. KOC stipulated on January 18, 2001 to the payment of $ 468,487.63, being the principal and interest to October 7th then due Willowbend. Willowbend received $ 366,847.63 on March 11, 2002, a sum inadequate to cover the principal then due. Willowbend agreed to the reduced sum to quiet the Dombrowskis despite the fact that the Dombrowskis had signed the January 18th stipulation. If Willowbend were to receive the principal balance still due plus interest thereon through today, it would do so at the expense of KOC. Equity dictates that Willowbend receive the balance due on principal and interest through March 11, 2002 and nothing more. [*14] The practical effect of this determination on interest is to enforce the parties' stipulation that the principal be paid so that interest thereon stops running.

Attorney Norris has sought and should be awarded his costs for filing the interpleader action in the sum of $ 5,432.

In summary the surplus proceeds are to be distributed as follows:

First to Attorney Norris to pay the costs of the interpleader action, $ 5,432.

Second to LBM to pay the interest owed on the first and second mortgages for the period from October 7 to February 8, 2002.

Third to Willowbend to pay the principal and interest owed on the third mortgage.

Fourth to remain in escrow pending a judgment as to whether the fourth mortgage is valid pursuant to G.L.c. 271, § 49.

ORDER

For the above stated reasons, it is ORDERED that Norris and LBM's motions for summary judgment be ALLOWED in part and DENIED in part, that Willowbend's motion for summary judgment be ALLOWED, and that KOC and the Dombrowskis' motions for summary judgment be DENIED. [6] The Clerk is directed to schedule a trial date in the October session as to the G.L.c. 271, § 49 claim [*15] concerning the fourth mortgage.

6 The pleadings are a hodgepodge. This decision is intended to encompass the following motions for summary judgment:

Norris: case 01-656 pleading # 22; case 02-286 pleading # 11.

LBM: case 01-656 pleading # 22; case 01-798 pleading # 43.

Willowbend: case 01-798 pleading # 42.

KOC: case 01-656 pleadings # 22 & 27; case 01-798 pleadings 43 & 47; case 02-286 pleadings # 11 & 14.

Dombrowskis: case 01-798 pleading # 41.

Gary A. Nickerson

Justice of the Superior Court

DATED: August 5, 2004

COPY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 06-2804 BLS1

notice sent 10/17/07
W.L.P..
J.P.B.
A.M.C.--R G
R.M.B.--B M
R.E.B.
A.E.S.--P L G T
J.O.T.
D.H.R.--T & W

(mm)

LR5-A LIMITED PARTNERSHIP

vs.

MEADOW CREEK, LLC, et al.

MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This matter is before the Court on cross-motions for partial summary judgment: Counterclaim and Third Party Defendants' Motion for Partial Summary Judgment, Paper #80; and Plaintiffs-in-Counterclaim and Third-Party Plaintiffs' Cross Motion for Partial Summary Judgment, Paper #83.

For purposes of this memorandum the Court will refer to the counterclaim and third-party defendants as the "LR5-A Group" and the plaintiffs-in-counterclaim and third-party plaintiff as the "Meadow Creek Group."

BACKGROUND

In the background are a series of loans from the LR5-A Group, or one of the entities therein, to the Meadow Creek Group, in connection with a real estate development project in Dracut, Massachusetts. For these purposes it is enough to understand that the Meadow Creek Group was the developer and the LR5-A Group, or one of its entities, was the non-conventional lender.

There have been a number of problems, such that the Meadow Creek Group is, and has been for some time, in serious default on the loans. This has caused a need for additional

ALL-STATE LEGAL®
EXHIBIT
E

financing and foreclosure activities from time to time.

On two occasions, the first on February 13, 2003, and the second on February 17, 2006, the parties entered into forbearance agreements at times of and in connection with additional financings. Each of these two forbearance agreements included broadly worded release language running from the Meadow Creek Group to the LR5-A Group, purporting to release LR5-A from any and all prior obligations and defaults. Again, the full breadth of the releases, the parties covered thereby, and other matters in connection therewith need not be detailed here. There are, in fact, factual disputes over aspects thereof.

A significant element in this case is that each of the promissory notes executed by the Meadow Creek Group as borrower, running to the LR5-A Group as lender, provide for a base interest rate of 21% per annum compounded monthly in arrears, based upon the outstanding principal balance. The significance of that interest rate is that it exceeds the 20% upper limit under G.L. c. 271, § 49, the Massachusetts Criminal Usury Statute.

The LR5-A Group seeks by its motion partial summary judgment in its favor for all claims against it which pre-date February 17, 2006, the date of the most recent release. In doing so it argues that the releases in the forbearance agreements resolve any such claims in the LR5-A Group's favor.

The Meadow Creek Group, in its motion, asks the Court to determine that the LR5-A Group is in violation of G.L. c. 271, § 49. Presumably, if such a determination is made, efforts will be made by the Meadow Creek Group to have the loan transactions modified or voided entirely.

The Court is of the view that it can perform a useful service to the parties if it resolves

these two competing positions.[1]

DISCUSSION

The first contested issue is whether claims under the Criminal Usury Statute can be released by agreements of the potential claimants such as is argued by the LR5-A Group with respect to the release language in the forbearance agreements.

The LR5-A Group contends that there is no law in Massachusetts which would support the proposition that a release of past claims, including those under G.L. c. 271, § 49, is unenforceable. It argues that this is particularly so in the context here of negotiated releases between two commercial entities represented by counsel. For this Court to rule otherwise, the LR5-A Group asserts, "no lawsuit which alleged a violation of the usury statute (or, for that matter, a violation of ch. 93A, ch. 176D or even an alleged violation of the civil RICO statute . . .) could ever settle, because the releases exchanged by the parties would always be subject to collateral attack as being against public policy and unconscionable." (Emphasis in original.)

The Meadow Creek Group takes the opposite approach. It argues that where, as here with G.L. c. 271, § 49, generally policy concerns rather than the protection of private property rights animate a statutory protection, that protection cannot be waived by contract.

Neither side has cited the Court to any Massachusetts case dealing with G.L. c. 271, § 49 that is directly on point on either side of the issue.

Thus, the Court looks first to the oft-cited usury case of Begelfer v. Najarian, 381 Mass. 177 (1980). One cannot read that opinion without coming away with a clear sense that the usury

[1] In this regard the Court observes that material factual disputes stand as a barrier to summary judgment wholly for either side.

statute is a legislative statement of Massachusetts public policy. As Justice Abrams writes in Begelfer: "No reason suggests itself why we should not give effect to the legislative policy expressed in G.L. c. 271, § 49. . . ." id. at 184; "[T]he Legislature has determined that as a matter of public policy person who charges more than twenty per cent interest must register with the Attorney General," id.; and "The public policy against usury is clearly a matter for grave legislative concern . . . and the wisdom of their choice or remedies is solely their responsibility." Id. at 185.

Over 100 years ago, the SJC noted that "[i]t has been said that where laws are enacted on grounds of general policy their uniform application for the protection of all citizens alike is desirable, and an agreement to waive their provisions is generally declared invalid. . . ." Washington National Bank v. Williams, 188 Mass. 103, 107 (1905).

Where a statute "rests upon grounds of public policy, it is not the power of one who may be directly affected by it to contract in advance that it may be disregarded." Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., 422 Mass. 318, 324 (1996). Here, of course, the LR5-A Group points out that it is not seeking prospective relief from the usury statute, but just relief for its past actions.

This Court concludes that G.L. c. 271, § 49 is sufficiently infected with public policy such that it cannot be the subject of an ordinary release or waiver. That is not to say, however, that a case involving claims under the statute cannot be resolved short of a full trial on the merits.

Having determined that the release language in the two forbearance agreements cannot eliminate or bar the claims under the Criminal Usury Statute does not mean that the LR5-A Group loses or that the Meadow Creek Group prevails. Issues, with material factual content,

remain as to whether the LR5-A Group found shelter in the safe harbor of G.L. c. 271, § 49(*d*) by filing appropriate and timely notices of its lending practices insofar as they relate to interest charges. See, e.g., Clean Harbors, Inc. v. John Hancock Life Ins. Co., 64 Mass. App. Ct. 347, 364-366 (2005).

Further, even if there were violations of G.L. c. 271, § 49, the Court must still make a determination "based on all the facts, circumstances, and conditions surrounding the loan, to void it, to rescind it, to refund, to credit any excess interest paid, to reform the contract, or to provide any other relief consistent with equitable principles." Id. at 366, quoting from Beach Associates, Inc. v. Fauser, 9 Mass. App. Ct. 386, 394 (1980). (Emphasis added.) This, of course, cannot be accomplished on the present summary judgment record.

As stated above, what remains with regard to the other grounds promoting the release language or attacking it, are all too factually intensive to be resolved on the present motions.

ORDER

For the foregoing reasons, the Counterclaim and Third Party Defendants' Motion for Partial Summary Judgment, Paper #80, is DENIED; and the Plaintiffs-in-Counterclaim and Third-Party Plaintiffs' Cross Motion for Partial Summary Judgment, Paper #83, is ALLOWED, in limited part only, to the extent that the release language in the two forbearance agreements does not eviscerate or bar the claims under G.L. c. 271, § 49.

Any stays for responding to the amended complaint or of discovery pending resolution of these motions, see, e.g., Paper #74, are hereby vacated.

Allan van Gestel
Justice of the Superior Court

DATED: October 17, 2007

SHECHTMAN
HALPERIN
SAVAGE
ATTORNEYS AT LAW

*A Limited Liability Partnership*

*Jonathan N. Savage, Esquire*
*Email address: jsavage@shlawri.com*

August 9, 2005

VIA EMAIL
Jerry Vande Werken, Esq.
Thompson Hine LLP
10 W. Broad Street, Suite 700
Columbus, Ohio 43215

RE: Brushy Brook

Dear Jerry:

This letter will confirm that we intend to use Realty Financial Partners VI Limited Partnership, or its nominee, for bridge financing. The following are the salient terms of said financing:

| | |
|---|---|
| Amount: | $2,500,000 |
| Interest provisions: | 21% compounded monthly, fully accruing, with $1,250,000 minimum interest paid. |
| Maturity: | one year from closing; no extension provisions. |
| Security: | First mortgage lien on property and all associated development rights and permits; collateral pledge of membership interests in borrower (fee owner). |

Without waiving any of our rights under the Asset Purchase Agreement, we anticipate that we will be utilizing a substitute bank to complete the project once all permits are in place.

86 WEYBOSSET STREET · PROVIDENCE · RHODE ISLAND · 02903 · TEL. 401.272.1400 · FAX 401.272.1403
352 [illegible]

EXHIBIT
F
ALL-STATE LEGAL®

Please acknowledge your receipt of this letter where indicated below and feel free to contact me if you have any questions.

Very truly yours,

Jonathan N. Savage

Receipt of the foregoing is acknowledged this 9th day of August 2005:

____________________________
Jerry Vande Werken, Esq.

JNS/ml
Cc: James Ottenbacher
William McComb
Charles Fogarty
Dr. Grant Schmidt

H:\ACTIVE\Savage\CM-30191 Acquisition of Reserve at Brushybrook, Hopkinton, RI\VandeWerken 05-08-08.doc

# PROMISSORY NOTE

$2,500,000

August 16, 2005
Boston, Massachusetts

1. Basic Terms.

1.1 Promise to Pay. Boulder Brook Development, LLC, a Rhode Island limited liability company having an address at ____________ (together with its successors and assigns, the "Borrower"), for value received, promises to pay to LR6-A Limited Partnership, a Massachusetts limited partnership (together with any successor holder or holders of this Note, collectively, "Lender"), at c/o LR6-A, Corp., Ten Post Office Square, Suite 750, Boston, MA 02109 or at such place as Lender hereafter may from time to time designate in writing, the principal sum of Two Million Five Hundred Thousand Dollars ($2,500,000) pursuant to the terms of this Note, with interest thereon, as set forth in this Note (the "Loan Amount"). This Note is the promissory note (the "Note") referred to in that certain Loan Agreement, dated as of the date hereof, by and between Borrower and Lender, (as it may be amended and supplemented from time to time, the "Loan Agreement"). In the event of any conflict between the provisions of this Note and the Loan Agreement, the provisions of the Loan Agreement shall govern. Capitalized terms not otherwise defined herein shall have the same meaning as defined in the Loan Agreement. This Note is secured by, among other things, a first Mortgage and Security Agreement of even date herewith, to be recorded and filed at Public Records of ____________________ County, Rhode Island which relate to Property located at __________ ______________________________, Hopkinton, Rhode Island, and more particularly described in the Mortgage, pledges of one hundred percent (100%) of the membership interests in Borrower and other related entities and affiliates owning additional collateral for this loan, and is further secured by other Collateral as set forth in the Loan Agreement.

1.2 Application of Payments. Except as otherwise provided herein, all payments made on this Note shall be applied in payment of amounts then due on account of principal, interest and any other sums or amounts due under this Note or any of the other Loan Documents in such order as Lender shall elect in its sole discretion.

1.3 Maturity. In any event, the entire outstanding principal balance of this Note, together with any accrued and unpaid interest (including Base Interest and Additional Interest) and other amounts due hereunder or under any other Loan Document, if not earlier paid or due and payable in accordance with the terms of this Note, shall be due and payable on the date (the "Maturity Date") which is the earlier of (i) August 16, 2006 or (ii) such other date on which the entire outstanding balance of this Note becomes due and payable in accordance with its terms.

There shall be no extension of the Maturity Date without the express written agreement of the Lender and Borrower.



EXHIBIT
A
ALL-STATE LEGAL®

2. Definitions.

Capitalized terms used without definition in this Note shall have the respective meanings ascribed to them in the Loan Agreement. As used in this Note, the following terms shall have the meanings indicated or referred to below.

"Additional Interest"-See Section 3.2.

"Base Interest" - See Section 3.1.

"Base Rate" - See Section 3.1.

"Borrowers" - See Section 1.1.

"Default Rate" - See Section 9.2.

"Event of Default" - See Section 8.

"Lender" - See Section 1.1.

"Loan Agreement" - See Section 1.1.

"Loan Amount" – See Section 1.1.

"Maturity Date"- See Section 1.3.

"Maturity Extension Fee" – See Section 1.3(a)

"Monthly Payable Interest" – See Section 3.2

"Quarterly Payable Interest" – See Section 3.3

"Note" - See Section 1.1.

"Payment Date" - See Section 3.2.

3. Interest.

3.1 Base Interest. Interest ("Base Interest") shall be payable on the outstanding principal balance of this Note and any and all other amounts owing by Borrower to Lender under this Note at the rate of twenty-one percent (21%) per annum (the "Base Rate"), compounded monthly. Base Interest shall be calculated on the basis of a three hundred sixty (360)-day year for the actual number of days elapsed.

3.2 Additional Interest. In addition to Base Interest, Borrowers shall be liable for and pay Lender additional interest ("Additional Interest") in an amount equal to the greater of (i) $1,250,000 less all Base Interest previously paid by Borrowers during the Loan term or (ii) all Base Interest payable under this Note less all Base Interest previously paid during the Loan term.

Additional Interest shall be fully paid regardless of when the Loan is paid in full, either prior to the Maturity Date or otherwise, as the case may be.

3.3 If at any time Lender receives from Borrower, or otherwise, any amount applicable to the amounts due under this Note, which is less than all amounts due and payable at such time, Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's sole discretion. Borrower agrees that neither Lender's acceptance of a payment from Borrower in an amount that is less than all amounts then due and payable, nor Lender's application of such payment, shall constitute or be deemed to constitute either a waiver of the unpaid amounts, or an accord and satisfaction.

3.4 In the absence of demonstrable error, the books and records of the Lender shall constitute prima facie evidence of the unpaid balance of all amounts due hereunder.

4. Payment of the Obligations. The balance of the all amounts due under this Note, including but not limited to all accrued but unpaid principal, Base Interest, Additional Interest, extension fees and other fees or charges, will be due and payable in full on the Maturity Date.

5. Application of Payments. At the Lender's option, the order of application of all payments received from the Borrower may be applied as follows: first, to fees and charges then due, including any extension fees; second, to Base Interest and third, to the outstanding principal balance of this Note.

6. Prepayment. The Borrower may prepay at any time the Loan in part or in whole, without penalty or premiums subject to payment of any unpaid charges, Base Interest, Additional Interest and principal. If Borrower desires to make a full prepayment, the Borrower shall have the right to do so provided that it pay concurrently with such prepayment the entire principal balance, all Base Interest due as calculated herein, all Additional Interest, extension and other fees, expenses, costs and other amounts owing to the Lender under this Note. In the case of any partial prepayment, the prepayment shall be applied in the order set forth in Section 5 above. The principal amount prepaid, if any, may not at any time be re-advanced and the Borrower shall remain liable for all interest due hereunder upon any full or partial prepayment.

7. Late Charges. If at any time prior to the Maturity Date, Borrower fails to deliver to Lender any monthly payment due hereunder within five (5) days of the Payment Date, Borrower shall then pay to Lender upon demand, in addition to all other amounts payable, a late charge equal to five percent (5%) of the amount of such payment (the "Late Charges"). This late charge will not apply to payment of principal, Base Interest and/or Additional Interest due on the Maturity Date. Said late charge shall be paid to defray the expenses incurred by Lender for the loss of use of the delinquent payment and the amount shall be secured by any security agreements securing sums due under this Note. Late charges shall not be taken into account in the calculation of interest due under Section 3 hereunder, but shall be due and payable in addition thereto.

8. Events of Default. It is expressly agreed that the occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

8.1 A default or failure in the payment, when due, under this Note, of any indebtedness or any other moneys secured hereby which shall continue for five (5) days; provided, however, the Borrower shall be afforded no grace period in the event of a maturity default and it shall be an Event of Default upon its failure to fully pay this Note upon the Maturity Date.

8.2 The occurrence of any Event of Default under the Loan Agreement or any of the other Loan Documents.

9. Remedies for Event of Default.

9.1 If an Event of Default shall occur, the Lender may, at its option, declare to be immediately due and payable the then outstanding balance of all principal sums due under this Note, with all accrued and unpaid interest thereon (including without limitation Base Interest and Additional Interest), late charges, and all other amounts payable to the Lender hereunder or under any of the Loan Documents, whereupon all such amounts shall become due and payable immediately. The failure of the Lender to exercise said option to accelerate shall not constitute a waiver of the right to exercise the same at any time.

9.2 In addition to all Late Charges that may be due and payable, from and after the Maturity Date or the occurrence of an Event of Default, whether or not all amounts due and payable hereunder are accelerated by Lender, interest shall accrue on all amounts due hereunder, whether principal or interest, at a default rate ("Default Rate") equal to twenty-six percent (26%) per annum, compounded monthly.

10. Recourse as to Borrower. Except to the extent of the liabilities assumed by any guarantor(s) pursuant to any guaranty of this Note or any of the Loan Documents and the collateral granted to Lender under the Loan Documents, (i) the Loan is recourse solely to Borrower and to the collateral granted to Lender pursuant to the Loan Documents, and (ii) Lender agrees that no partner of Borrower or any interest-holder in Borrower or any shareholder, officer, director, agent, member or partner thereof may be held personally liable for the obligations of Borrower under this Note or the Loan Documents. The provisions of this paragraph shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by the Mortgage or other Loan Documents; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (iii) affect the validity or enforceability of any guaranty or pledge made in connection with this Note or the Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; or (v) impair the enforcement of the Collateral Assignment of Leases and Rents or any other Collateral securing this Note.

11. Usury. Under no circumstances shall the aggregate amount paid or agreed to be paid as interest hereunder or under any other Loan Documents exceed the highest lawful rate permitted under applicable usury law (the "Maximum Rate") and the payment obligations of the Borrower under this Note and any other Loan Documents are hereby limited accordingly. If any provision of this Note is held to be invalid or unenforceable by a court of competent jurisdiction, the other provisions of this Note shall remain in full force and effect. Subject to the foregoing, it is the express intention of Borrower and Lender to conform strictly to any applicable usury laws.



K/

Accordingly, all agreements between Borrower and Lender, whether now existing or hereafter arising, and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity of this Note or otherwise, shall the amount paid or agreed to be paid to Lender for the use, forbearance or detention of the money delivered to Borrower as advances under this Note, in each case pursuant to the terms of this Note or the other Loan Documents, or for the payment or performance of any covenant or obligation contained herein or in any of the other Loan Documents exceed the maximum amount permissible under applicable law. If, from any circumstance or contingency whatsoever, fulfillment of any provision of this Note or of any other Loan Document at the time performance of such provision shall be due shall involve transcending any limit validly prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and, if from any such circumstance or contingency, Lender shall ever receive as interest or otherwise an amount which would exceed the maximum rate of interest permitted by applicable law, the amount of such excess shall be applied to a reduction of the indebtedness evidenced by this Note, and not to the payment of interest. If such excessive interest exceeds such indebtedness, the amount of such excessive interest shall be refunded to Borrower. If at any time this Note prescribes a rate of interest in excess of the maximum rate permitted by law, all sums paid or agreed to be paid to Lender for the use, forbearance or detention of the money delivered to Borrower as purchase price for this Note or otherwise advanced, in each case pursuant to the terms of this Note or the other Loan Documents, shall be amortized, prorated, allocated and spread throughout the term of such indebtedness until payment in full, so that the actual rate of interest on account of such indebtedness is uniform throughout the term hereof. Borrower assents to Lender notifying the Massachusetts Attorney General as to the terms of this Note to the extent Massachusetts law requires the same.

12. Making of Payments. All payments of principal, interest and other amounts hereunder are payable in lawful money of the United States of America at the office of the Lender or at such other place and in such manner as the Lender may specify by notice to the Borrower. If the date for any payment hereunder falls on a day which is not a Business Day, then for all purposes hereof the same shall be deemed to have fallen on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest hereunder. The term "Business Day" shall mean a day other than a Saturday, Sunday or legal holiday for banking institutions under the laws of the Commonwealth of Massachusetts.

13. Miscellaneous.

13.1. Waivers. The Borrower and all other parties liable hereunder, whether as principal, endorser or otherwise, hereby severally waive presentment, demand for payment, protest and notice of dishonor, and waive recourse to suretyship defenses generally, including extensions of time, release of security or other indulgences that may be granted by the Lender to the Borrowers or any other party liable hereon, and also agree to pay all costs of collection, including reasonable attorneys' fees incurred by the Lender in connection with enforcement of any of the Lender's rights hereunder or under the Mortgage.

13.2. No Waiver. Any forbearance by the Lender in exercising any right or remedy hereunder or any Loan Document, or otherwise afforded by applicable law, shall not be a waiver

or preclude the exercise of any right or remedy by the Lender. The acceptance by the Lender of payment of any sum payable hereunder after the due date of such payment shall not be a waiver of the right of the Lender to require prompt payment when due of all other sums payable hereunder or to declare a default for failure to make prompt payment.

13.3. Amendments. This Note may not be changed, modified or terminated except in writing signed by the party to be charged.

13.4. Governing Law. This Note shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts without regard to application of choice of law principles.

13.5 Personal Jurisdiction. The Borrower and each Loan Party: (i) hereby irrevocably submit to the jurisdiction of the state courts of the Commonwealth of Massachusetts and to the jurisdiction of the United States District Court for the District of Massachusetts, for the purposes of any suit, action or other proceeding arising out of or based upon the provisions hereof or of any other of the Loan Documents, and (ii) hereby waive to the extent not prohibited by law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such proceeding brought in one of the above-named courts is brought in an inconvenient forum or that the venue of any such proceeding brought in one of the above-named courts is improper. The Borrower and each Loan Party hereby consent to service of process in any such proceeding in any manner permitted by Chapter 223A of the General Laws of The Commonwealth of Massachusetts, and agree that service of process by either registered or certified mail, return receipt requested, at the address specified above is reasonably calculated to give actual notice. Any notice or other communication in connection herewith shall be deemed to be delivered if in writing (or in the form of a facsimile transmission) addressed as specified above and if either: (i) actually delivered at said address, or (ii) in the case of a letter, three business days shall have elapsed after the same shall have been deposited in the United States mails, postage prepaid and registered or certified.

13.6 Severability. If any term of this Note, or the applications hereof to any person or set of circumstances, shall to any extent be invalid, illegal, or unenforceable, the remainder of this Note, or the application of such provision or part thereof to persons or circumstances other than those as to which it is invalid, illegal, or unenforceable, shall not be affected thereby, and each term of this Note shall be valid and enforceable to the fullest extent consistent with applicable law and this Note shall be interpreted and construed as though such invalid, illegal, or unenforceable term or provision (or any portion thereof) were not contained in this Note.

13.7 Surrender. If, after receipt of any payment of all or any part of this Note, Lender is compelled or agrees, for settlement purposes, to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or avoidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Note and the Loan Documents shall continue in full force and effect or be reinstated, as the case may require, and the Borrower shall be liable for, and shall indemnify, defend and hold harmless Lender with respect to the full amount so surrendered. The provisions

of this Section shall survive the cancellation or termination of this Note and shall remain effective notwithstanding the payment of the obligations evidenced hereby, the release of any security interest, lien or encumbrance securing this Note or any other action which Lender may have taken in reliance upon its receipt of such payment. Any cancellation, release or other such action shall be deemed to have been conditioned upon any payment of the obligations evidenced hereby having become final and irrevocable.

13.8 Bind and Inure. This Note shall be the joint and several obligation of all makers, endorsers, guarantors and sureties, and shall be binding upon them and their respective successors and assigns and shall inure to the benefit of the Lender and its successors and assigns.

13.9 Notices. All notices under this Note shall be given as provided in the Loan Agreement.

13.10 Time of Essence. It is expressly agreed that time is of the essence with respect to this Note.

13.11 Authority. Borrower (and the undersigned representative of Borrower, if any) represent that Borrower has full power, authority and legal right to execute and deliver this Note, the Mortgage, the Assignment and any other instruments or documents executed in conjunction with this Note.

14. Collection Costs. The Borrower will pay on demand all out of pocket collection costs and reasonable attorney's fees paid or incurred by the Lender in enforcing all obligations of Borrower under this Note or any costs of collection and reasonable attorneys' fees incurred in enforcing the liability of any endorser or Guarantors with respect to such obligations. If not paid when due, such collection costs and attorneys fees shall constitute additional sums due hereunder and be secured by the collateral securing this Note. Further, in the event there exists an Event of Default and the Lender has not yet accelerated this Note on account thereof, the Borrower may not thereafter cure such default as to avoid acceleration without also reimbursing the Lender for its reasonable collection costs and attorneys' fees incurred up to and including the date of such cure.

15. Borrower's Acknowledgments as to Place of Execution and Performance of this Note. The Borrower hereby acknowledges, based upon information provided to Borrower by Lender, as follows:

15.1 Lender is a Massachusetts limited partnership created under and utilizing the established and predictable laws of the Commonwealth of Massachusetts.

15.2 Lender's general partner is a Massachusetts corporation created under and utilizing the established and predictable laws of the Commonwealth of Massachusetts.

15.3 Lender and its General Partner are solely domiciled in, have a usual and customary place of business in, and carry out their business in the Commonwealth of Massachusetts.

15.4 Borrowers solicited the loan subject to this Note from the Lender in the Commonwealth of Massachusetts, all Loan Documents were delivered to the Lender in the Commonwealth of Massachusetts, and any and all payments under the Note shall be made to Lender only at the Massachusetts address set forth herein.

15.5 Borrower acknowledge the Lender is relying on the above representations in entering into this transaction.

16. Exempt Transaction. Borrower acknowledges and agrees that the Loan is exempt under the Truth in Lending Act (15 U.S.C.A. § 1601 et seq.) or the related provisions under Massachusetts State Law (M.G.L. ch. 140D).

17. WAIVER OF TRIAL BY JURY. THE BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM FILED BY EITHER PARTY, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THIS NOTE, THE OTHER LOAN DOCUMENTS, OR ANY ACTS OR OMISSIONS OF THE BANK IN CONNECTION THEREWITH.

18. PREJUDGMENT REMEDY WAIVER. THE BORROWER HEREBY REPRESENTS, COVENANTS AND AGREES THAT THE TRANSACTION TO WHICH THIS NOTE RELATES IS A "COMMERCIAL TRANSACTION" AS DEFINED BY THE STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS. THE BORROWER HEREBY WAIVES ALL RIGHTS TO NOTICE AND PRIOR COURT HEARING OR COURT ORDER UNDER MASSACHUSETTS GENERAL LAWS, AS AMENDED, OR UNDER ANY OTHER STATE OR FEDERAL LAW WITH RESPECT TO ANY AND ALL PREJUDGMENT REMEDIES THE LENDER MAY EMPLOY TO ENFORCE ITS RIGHTS AND REMEDIES HEREUNDER.

[SEE ATTACHED SIGNATURE PAGE]

IN WITNESS WHEREOF, this Note has been executed under seal as of the date first set forth above.

BORROWER:

BOULDER BROOK DEVELOPMENT, LLC, a Rhode Island limited liability company

By: ______________________________
, its Manager